**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

DERRICK HAMILTON,

                                        Plaintiff,

          v.                                                    No. 06-CV-805
                                                                     (GTS/DRH)

J.T. SMITH, Superintendent, Shawangunk
Correctional Facility; J. MALY, Deputy
Superintendent of Security; WILLIAM M.
GONZALEZ, Deputy Counsel; M. GENOVESE,
Medical Doctor; M. SKIES, Registered Nurse;
DONALD SELSKY, Director of Special Housing;
D. PARISI, Mail Room Clerk; F. CHIAPPERINO,
Counselor; and ELAINE DAVIS, Steward, Attica
Correctional Facility

                                        Defendants.

_____

**APPEARANCES:**                                **OF COUNSEL:**

DERRICK HAMILTON
Plaintiff Pro Se
93-A-5631
Shawangunk Correctional Facility
Post Office Box 700
Wallkill, New York 12589

HON. ANDREW M. CUOMO                   CHRISTINA L. ROBERTS-RYBA, ESQ.
Attorney General for the               Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

     Plaintiff pro se Derrick Hamilton ("Hamilton"), an inmate in the custody of the New York

_____

     [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

State Department of Correctional Services ("DOCS"), brought this action against nine

DOCS employees[2] pursuant to the Civil Rights Act, 42 U.S.C. § 1983; the Religious Land

Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq. ("RLUIPA");[3] and

the Health Insurance Portability and Accountability Act, 29 U.S.C. § 1182 ("HIPAA").

Hamilton  alleges that defendants violated his rights to religious freedom and confidentiality

as well as his constitutional rights under the First, Eighth, and Fourteenth Amendments.

Am. Compl. (Docket No. 17).  Presently pending is defendants' motion for summary

judgment pursuant to Fed. R. Civ. P. 56.  Docket No. 51.  Hamilton opposes the motion.

Docket No. 58.   For the following reasons, it is recommended that defendants' motion be

granted in part and denied in part.


## I. Background

The wide-ranging facts asserted by Hamilton are related herein in the light most

favorable to Hamilton as the non-moving party.  See subsection II(A) infra.  At all times

---

[2] In his memorandum of law, Hamilton concedes that defendant Parisi "should be withdrawn from the complaint . . . [as she] was simply following orders from defendant's [sic] Smith and Maly, therefore is not liable in this action."  Hamilton Mem. of Law (Docket No. 58) at 34.  Defendants' motion as to Parisi should, therefore, be granted.

[3] Hamilton mistakenly brings this action pursuant to the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. ("RFRA").  However, "[t]he [RFRA . . . was declared unconstitutional by the . . . Supreme Court in 1997 . . . [and] was amended by the [RLUIPA]."  Hankins v. New York State Dep't of Corr. Serv., No. 07-CV-408 (FJS/GHL), 2008 WL 2019655, at *1 n.1 (N.D.N.Y. Mar. 10, 2008).  "[A] plaintiff's RLUIPA claim may be construed as an extension of its inartfully pleaded RFRA claim," particularly when asserted by a pro se litigant whose pleadings are "construed with [an] extra liberal leniency . . . ."  Id. (citing Phillips v. Girdich, 408 F.3d 124, 130 (2d Cir. 2005) ("[T]he court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.")).  accordingly, Hamilton's claim under the RFRA will be deemed asserted under the RLUIPA.

relevant herein, Hamilton was incarcerated first at the DOCS facility at Attica and then at the DOCS facility at Shawgunk.  Am. Compl. ¶ 2.

## A. Family Court Proceedings

On October 10, 2003, while Hamilton was still incarcerated at Attica, he was ordered to be produced in Kings County Family Court for a paternity proceeding.  Docket No. 58-2 at 3.  On December 29, 2003, defendant Gonzalez, a DOCS Deputy Counsel, wrote to that court advising that "certain security and logistical impediments . . . ma[d]e it impractical for [DOCS] to produce [Hamilton] personally at the Court."  Id. at 4; Am. Compl. ¶ 19; Docket No. 51-5 at 220.  Gonzalez requested that Hamilton be allowed to appear telephonically on the appointed date.  Am. Compl. ¶ 9; Docket No. 51-5 at 221; Docket No. 58-2 at 3.  On January 7, 2004, Hamilton participated telephonically in the court proceedings, which were adjourned to April 28, 2004.  Am. Compl. ¶ 20.  Facility records indicated that "on March 3, 2006 [Hamilton] refused to attend the teleconference scheduled for March 21, 2006."  J. Smith Decl. (Docket No. 53-3) ¶¶ 42-43.

On April 28, 2004, "[b]oth parties failed to appear . . . and [pursuant to a court order dated July 23, 2004,] the petition was dismissed without prejudice."  Docket No. 51-5 at 217; Docket No. 58-2 at 8.  The court advised Hamilton that his "remedies [we]re to make a motion before the Support Magistrate to vacate the default and reargue the matter, file a new petition, or appeal the dismissal."  Docket No. 51-5 at 217; Docket No. 58-2 at 8.  Hamilton filed a grievance complaining that defendants interfered with his court proceeding and their failure to produce him on April 28, 2004 which resulted in the dismissal of his

3

paternity suit.  Docket No. 58-2 at 11.  The grievance was denied on the ground that "[t]here [wa]s no record of a request being made for [a conference] call after [January 7, 2004]."  Id. at 12.


## B. Medical Treatment

### 1. Mental Health Assessment

On March 17, 2005, Hamilton arrived at Shawangunk and was given a health screening interview by defendant Skies.  Am. Compl. ¶ 21; Docket No. 58-2 at 16.  During the interview, Hamilton stated that he had previously attempted suicide and was feeling suicidal during the inquiry.  Am. Compl. ¶ 21; Docket No. 58-2 at 16.  Hamilton testified that while he has had suicidal thoughts before, he has never harmed himself nor attempted to commit suicide.  Hamilton Dep. (Docket No. 51-5) at 19-20.  Skies did not recommend Hamilton for a mental health referral or place him on suicide watch.  Am. Compl. ¶ 21.


### 2. Confidentiality

On or about January 24, 2006, Hamilton filed a grievance for defendants' alleged failure to treat him.  Am. Compl. ¶ 37.  Hamilton alleged that the medical department failed to (1) order blood tests,[4] (2) determine whether the medication that Hamilton was taking would cause or contribute to liver damage, and (3) whether his diagnoses of high blood pressure, high cholesterol, and hepatitis A were causing or contributing to Hamilton's other medical

---

[4] During his deposition, Hamilton withdrew any contentions regarding defendant Genovese's failure to order blood screening.  Hamilton Dep. (Docket No. 51-5) at 37-38, 40-41, 75.

ailments.  Id.  On or about February 1, 2006, the medical department disclosed Hamilton's

medical records to the grievance department in connection with the grievance.  Id.  ¶ 38;

Hamilton Dep. at 38, 78-80.  The disclosure was made without Hamilton's prior consent.

Am. Compl. ¶ 38.  Hamilton filed another grievance on February 3, 2006, arguing that the

rules which surrounded his medical confidentiality had been violated.  Docket No. 51-5 at

208; Docket No. 58-2 at 31.  On February 9, 2006, the grievance was denied because

"when the grievant files a grievance concerning medical care or treatment he [or she]

affirmatively puts the issue into contention resulting in an implied waiver of confidentiality."

Docket No. 58-2 at 33; J. Smith Decl. ¶¶ 28-30; Hamilton Dep. at 38-39.


### 3. Drug Addiction

Hamilton is allergic to marijuana and even second-hand inhalation contaminates his

urine.[5]  Am. Compl. ¶ 84; Hamilton Dep. 62-63; Docket No. 58-5 at 2-4.  This allergy was

the basis of a complaint of medical indifference for a failure to treat Hamilton's drug

addiction disease.  Hamilton Dep. at 111-12.  While in the Special Housing unit (SHU),[6]

Hamilton was exposed to marijuana smoke from other unidentified inmates.  Id. at 113.

Additionally, the policy of ordering all windows closed in SHU and allowing the smoke to

─────────────────

[5] Hamilton adamantly denies ever smoking marijuana while in prison or being
addicted to it prior to his incarceration.  Hamilton Dep. at 119-20.

[6]SHUs exist in all maximum and certain medium security facilities.  The units
"consist of single-occupancy cells grouped so as to provide separation from the   general
population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b) (1995). Inmates are
confined in a SHU as discipline, pending resolution of misconduct
charges, for administrative or security reasons, or in other circumstances as
required.  Id. at pt. 301.

linger resulted in an aggravation of Hamilton's allergy and his positive urinalysis tests.  Id. at 115-16.  After moving to a different unit, Hamilton's urinalysis tests were negative and he has not felt the effects he experienced in SHU.  Id. at 113-15.

### 4. Water Treatment

Hamilton also contends that the facility's water was treated with chemicals with deliberate indifference to their effects on his health in light of other medications which Hamilton regularly took.  Am. Compl. ¶ 54; Hamilton Dep. at 51-52, 77-78.  More specifically, Hamilton asserts that the sodium in the water interfered with the treatment of his high blood pressure and cholesterol.  Docket No. 51-5 at 229.  On October 10, 2006, Hamilton's grievance was denied on the ground that the "facility water sodium level is below the 20 mg/l benchmark for individuals on severely restricted sodium diet[s]."  Id.

### C. Living Conditions

### 1. Contaminated Drinking Water

Additionally, on March 17, 2005, Hamilton was placed in a cell which had a "plumbing problem that caused feces and other bacteria to contaminate the water."  Am. Compl. ¶ 22; Hamilton Dep. at 65-66.  Hamilton remained in that cell for more than sixty days, from March 17 to July 1, 2005, and suffered severe stomach aches and pains and contracted Hepatitis A.  Id.  ¶¶ 22, 52; Hamilton Dep. at 27-30.  Hamilton alleges that he received no medical treatment for his Hepatitis.  Am. Compl.  ¶ 23; Hamilton Dep. at 30-32.

Hamilton filed a grievance on March 29, 2006, complaining that since his return to SHU

five days earlier, the water was "tinted yellowish-brown . . . [and he had been] unable to drink the water because it [wa]s obvious [that] it [wa]s contaminated with bacteria."  Docket No. 58-5 at 23.  Additionally, on September 11, 2008, a memorandum was sent to defendant Smith complaining about the water, stating that it "was jet black and full of dross and sediment . . . ."  Docket No. 58-5 at 12.  Despite the appearance of the water, correctional facility staff indicated that it was still safe to consume.  Id.  Complaints about the water had persisted for a substantial period of time and stated that there had been multiple inquiries from prisoners to the administrators as to why the "water [wa]s either beige, brown, or black, and reeks the scent of sewage," on a daily basis.  Id. at 13.[7]

Defendants did not provide bottled water to the inmates during these occurrences and also did not allow SHU prisoners who had lost commissary privileges to buy bottled water from the commissary.  Am. Comp. ¶ 43.  The water at Shawangunk is regularly tested and "[a]t all times relevant to this litigation . . . has met all standards established by the Department of Health."  J. Smith Decl. ¶ 22, Docket No. 53-3 at 64-68; see also Docket No 51-5 at 235 ("[A] complete battery of tests were performed on [the] facilit[y's] drinking water. There was no lead or copper detected and only a trace amount of iron . . . . [T]hus the f]acility water . . . meets all standards as established by the Department of Health.")

Hamilton still suffers from minor gas pains and bowel irregularities attributed to the

_____

[7] Attached as an exhibit are three  responses which were difficult to decipher due to poor photocopying quality.  Two of the three documents were dated, one May 5, 2006 and the other September 22, 2008.  Docket No. 58-5 at 22, 25.  Additionally, Hamilton submits an affidavit from a fellow prisoner who discusses "the strange taste of the water and the frequent and often unannounced shut downs of the water system," as well as the "constant complaints from the men around [him] . . . regarding drinking water, [specifically] the color, smell and taste of the water."  Docket No. 58-5 at 16.  This same inmate describes the discoloration and peculiar odor of the drinking water.  Id.

water.  Hamilton Dep. at 71-72.  The only treatment given Hamilton was a topical ointment for his legs and feet.  Id. at 72, 134-35.  Additionally, he contends that the high iron levels in the water have compromised his nervous system, but he has not sought medical attention for that specific ailment.  Id. at 135.

## 2. Ventilation

From November 30, 2005 until March 25, 2006, Shawangunk policy dictated that all windows in the unit remain closed.  Am. Compl. ¶ 36; Hamilton Dep. at 35-36.  The lack of ventilation caused Hamilton to suffer nose bleeds and a watering throat and eyes.  Am. Compl. ¶ 36.  On December 15, 2005, Hamilton, and the other inmates were given a memorandum stating that (1) the current heating and cooling system was in excellent working condition, (2) windows must remain closed at all times during the winter months, and (3) during these winter months, inmates received fresh air from the ventilation system and the inner courtyards.  Docket No. 51-5 at 245; Docket No. 58-3 at 51; J. Smith Decl. ¶¶10-11; Hamilton Dep. at 36.  On or about January 10, 2006, Hamilton filed a grievance relating to the ventilation system claiming that its constant malfunction was causing him medical problems.  Docket No. 58-3 at 12.

From March 24 until May 6, 2006, the ventilation vents and grates were saturated "with dust, soot and carbon dioxide," and the light fixtures were extremely dusty and dirty.  Am. Compl. ¶ 44.  Also, between approximately July 14 and July 23, 2008, fifty complaints were lodged by inmates pertaining to the cleanliness and functionality of the ventilation system.  Docket No. 58-3 at 13-50.  Moreover, Hamilton complained that the recreational area was

covered with mold and dust.  Hamilton Dep. at 92-95.  The mold was green, black, and brown, and covered the walls and gates.  Id. at 93.  The mold also caused Hamilton to suffer bloody noses, an irritated throat, and a burning sensation in his eyes.  Id. at 94-95.

### 3. Lighting

From March 24 until approximately May 7, 2006, the lights were not turned off in the SHU galley.  Am. Compl. ¶ 45; Hamilton Dep. at 56-58.  The exposure to bright lights[8] all night caused Hamilton to lose sleep.  Am. Compl. ¶ 45.  Hamilton spoke to the medical staff about his insomnia, and they recommended doing exercises to assist him with falling asleep.  Hamilton Dep. at 57.  Correctional facility staff explained that the lights remained on in the SHU for security reasons.  Hamilton Dep. at 56-58.

### D. Disciplinary Hearing and Rehearing

On January 12, 2005, Hamilton was selected for a random drug test and tested positive.[9]  Selsky Decl. (Docket No. 53-3 at 33-36) ¶ 8; Docket No. 58-3 at 53.  Hamilton was found guilty of violating Rule 113.24[10] at a disciplinary hearing at Attica on January 31, 2005.  Selsky Decl. ¶¶ 8-9.  Hamilton appealed the decision and on April 7, 2005, a rehearing was ordered for April 12, 2005 at Shawangunk.  Id.  ¶ 10; Docket No. 58-4 at 29.

---

[8] During Hamilton's deposition, he described this as an exaggeration and testified that the lights were neither blinding nor shining directly on him.  Hamilton Dep. at 141-42.

[9] See subsection B(2) supra.

[10] Rule 113.24 prohibits the use of any controlled substance unless prescribed by facility medical staff.  Selsky Decl. ¶ 9.

9

Hamilton refused to attend the rehearing.  Docket No. 58-3 at 53.  Hamilton alleges "that the rehearing was perfunctory and . . . violated more due process rights than the first hearing . . ." because (1) he was not provided with appropriate employee assistance to retrieve information sufficient to defend his case, (2) Hamilton was still unable to call the witnesses he deemed necessary which had led to the reversal of the first hearing,[11] and (3) over three months had passed since the time of the incident and in the interim Hamilton had been transferred, a witness had been released from custody, requested documents were difficult to locate or recall, the case was irreparably flawed, and DOCS should have been found at fault.  Docket No. 58-4 at 30-38.  Hamilton took issue with DOCS' refusal to contact D. Mathis, a former inmate, who eventually submitted an affidavit admitting that an Officer Fix told Mathis to provide him with what they both knew was dirty urine, attached Hamilton's name on Mathis' sample, tested the sample with positive results, and wrote Hamilton an unwarranted disciplinary charge for alleged drug use.  Mathis Aff. (Docket No. 58-4 at 50-51) ¶¶ 2, 4, 6; Hamilton Dep. at 96-98, 121-23.

Defendants determined that Hamilton refused to attend the rehearing and proceeded in his absence.  Selsky Decl.  ¶¶ 13, 15.  Hamilton was ultimately found guilty of the charges and sentenced to eighteen months in SHU, loss of package privileges, commissary, telephone privileges, and twelve months loss of good time credit.  Id.  ¶ 15; Am. Compl. ¶ 25.  On June 13, 2005, the conviction was affirmed, but the SHU penalty was modified to twelve months.  Am. Compl. ¶ 26.  Hamilton ultimately served ten months of the sentence.

---

[11] These witnesses included individuals who were aware of the selection and urinalysis testing procedures, counselors from the substance abuse program Hamilton was attending, and Mathis.  Hamilton Dep. at 47-48, 96-98.

Am. Compl. ¶ 27.  Hamilton was removed from the drug and alcohol treatment program in which he was enrolled pursuant to facility rules.

### E. Mail Tampering

On May 18, 2005, Hamilton was sent a letter from Brooklyn Law School responding to a request for legal assistance from Hamilton on March 21, 2005.  Am. Compl. ¶ 28; Docket No. 58-3 at 5.  The law school's response referred to other communications which Hamilton contends he never received.  Am. Compl. ¶ 28; Docket No. 58-3 at 5.  However, the law school "informed [Hamilton] in July 2002 that it could not be of assistance . . . [and requested that s]ince [they would] not be able to assist [him, that he] please refrain from sending [them] any further papers."  Docket No. 58-3 at 5.

Additionally, in June 2005, Nicole Esters sent Hamilton the Mathis affidavit,[12] but Hamilton did not receive it.  Am. Compl. ¶ 29.  On July 27, 2005, Esters sent Hamilton a letter stating that "on two separate occasions [she] mailed . . . a notarized affidavit . . . ." to him at Shawangunk.  Docket No. 58-3 at 2.  The document was mailed on June 21 and July 5, 2005, both times by first class mail.  Id.  The documents were never returned to Esters.  Id.  On August 25, 2005, Hamilton wrote a letter requesting an investigation regarding mail being stolen from several inmates by staff.  Docket No. 58-3 at 6; Am. Compl. ¶ 31.

In December 2005, Nicole Saunders sent Hamilton legal documents via Federal Express.  Am. Compl. ¶ 34.  The documents never reached Hamilton, but they were assigned a tracking number.  Id.  When Saunders tracked the items, she discovered that

---

[12]See subsection D supra.

the items were received at the Shawangunk facility.  Id.  She was informed by mail room

staff that defendant Maly was in possession of the documents and that if the documents did

not comply with facility protocol, they would be sent back to her with a letter.  Id.  ¶ 35;

Hamilton Dep. at 32-33.  Saunders never received either the letter or the legal documents.

Am. Compl. ¶ 35.[13]

While Saunders was attempting to send Hamilton the legal documents, Hamilton was

placed on mail watch "[d]ue to an investigation involving all inmate correspondence with

Prisoner Legal Services of Buffalo New York."  J. Smith Decl. ¶ 6.  The mail watch lasted

from December 12, 2005 to March 10, 2006.  Id.  During that period, any mail which met the

DOCS criteria articulated in Directives 4422 and 4421 would be delivered to Hamilton.  Id.

¶ 7.

**F. Religious Meals**

On July 20, 2005, Hamilton declared that "after religious counseling, [he] profess[ed] to

be of the Jewish faith and not of the Roman Catholic faith as previously listed."  Docket No.

58-2 at 19.  Sometime thereafter, Hamilton was diagnosed with high blood pressure and

cholesterol and was placed on a low-sodium medical diet.  Am. Compl. ¶ 40; Hamilton Dep.

at 41-42.  Hamilton filed a grievance on January 27, 2006 alleging that Shawangunk

refused to provide him with a medical diet which also complied with his religious tenets.

Docket No. 58-2 at 24; Hamilton Dep. at 101-103.  The grievance was denied because,

pursuant to Directive 4311, "[i]nmate requests for religious foods/diets, shall not be

---

[13] Hamilton testified at his deposition that he could not recall to whether Esters or
Saunders was the person involved in this mailing. Id. at 27.

prescribed by the health care provider . . . [and thus i]t is [Hamilton's] option to select either a religious diet or a medically prescribed diet."  Docket No. 58-2 at 24 (internal citations omitted); J. Smith Decl. ¶¶ 32-35 (explaining that the religious diet is a state-wide menu provided by an outside vendor and, as such, there is currently no religious diet option for those practicing Judaism who require the therapeutic standards of meals which are low in fat, cholesterol, and sodium); Hamilton Dep. at 43-44.

On October 13, 2006, Hamilton complained that Shawangunk "refuse[d] to allow [him] to receive kosher foods low in sodium, [w]hich [he is] required to eat due to religious and medical dietary needs."  Docket No. 58-2 at 23.  Hamilton requested that he be allowed either to purchase foods through the commissary to supplement his diet or that the facility order an additional low-sodium, kosher, cold, alternative diet tray.  Id.  Again, Hamilton's grievance was denied.  Docket No. 51-5 at 237; Docket No. 58-2 at 22.  Hamilton appealed the denial, but that appeal was denied.  Docket No. 58-2 at 25-26.

While Hamilton was receiving the religious and not the therapeutic diet, his blood pressure and cholesterol levels elevated.  Hamilton Dep. 43.  Because Hamilton was unable to receive a religious meal that complied with his therapeutic conditions, he was forced to change his religion.[14]  Id. at 44.

---

[14] Hamilton testified that "[I] studied . . . [and] affiliated with almost every religion . . . [because] you're only limited to go to one religious service at a time, so if [he] wanted to learn about Judaism, I just couldn't go down to the Judaism service to learn. I had to convert first and then go there to learn."  Hamilton Dep. at 45-46.  Hamilton recently converted to Christianity but continued to assert the religious meals claim.  Id. at 70.

### G. Notification of the Death of a Family Member

Hamilton's son, Andrell Napper, died while Hamilton was incarcerated at Shawangunk.

See generally Docket No. 58-5 at 40.  Hamilton had never listed Napper as one of his

children when he entered DOCS custody and Napper did not identify himself as Hamilton's

son when he visited Hamilton in prison.  Hamilton Dep. at 124-26, 128-29.  Additionally,

Hamilton was not legally recognized as Napper's father until January 3, 2000 when the child

was approximately fifteen years old.  Docket No. 58-5 at 44.

Hamilton was thus unable to request leave to attend Napper's funeral.  On August 24,

2006, Hamilton was advised by Napper's mother of the circumstances surrounding

Napper's death.  Hamilton Dep. at 138-39.  "Maly reports that the facility made every

reasonable effort to verify the relationship between [Hamilton] . . . and [the] deceased.

Unfortunately, no documentary evidence was found to confirm a relationship."  Docket No.

51-5 at 252; Docket No. 58-5 at 45, Hamilton Dep. at 136-38.  Hamilton appealed the

denial, claiming that he was never questioned about his relationship to Napper.  Id.;

Hamilton Dep. at 131-34 On appeal, the request was again denied.  Docket No. 51-5 at

254; Docket No. 58-5 at 46-47.


### H. Placement in Close Supervision Unit

On June 1, 2006, Hamilton was placed in Shawangunk's Close Supervision Unit (CSU)

without a hearing or an opportunity to dispute the placement.  Am. Compl. ¶ 81.  This

placement was based on false information given by Smith.  Hamilton Dep. at 104-11.

Hamilton's placement in CSU was "based on . . . [his] proven inability to coexist in the

general population evidenced by [his] disruptive conduct, poor custodial adjustment and . . . involvement in an unusual incident which resulted in the stabbing death of another inmate." Docket No. 58-5 at 27; Hamilton Dep. at 104-05.  Hamilton contends that he was not involved in the stabbing, an assertion with which Smith concurred but did nothing to to correct in Hamilton;s records.  Hamilton Dep. at 110-11.

While in CSU, Hamilton lost the opportunity to engage in employment in the mess hall. However, Hamilton did not want a job and, if he did, CSU permitted employment as a porter.  Id. at 108-09.  Hamilton was still permitted to go to the library and commissary.  Id. at 109.

## II.  Discussion

In his amended complaint, Hamilton alleges multiple violations of federal statutes and constitutional rights.  First, Hamilton asserts that his First Amendment rights were violated when defendants (1) disclosed his confidential medical information to other staff in retaliation for Hamilton filing grievances, (2) tampered with his mail, (3) failed to produce him for his Family Court proceedings, and (4) refused to provide him with a therapeutic meal which also complied with his religious tenets.  Second Hamilton asserts that his Eighth Amendment rights were violated when defendants (1) subjected him to contaminated water, dusty cells, broken ventilators, and mold-infested recreation areas; (2) failed to protect his medical confidentiality; (3) refused to provide him with medical treatment for his mental health ailments, drug addiction, or Hepatitis A; and (4) deliberately treated the drinking water with chemicals that aggravated his underlying medical problems.  Finally, Hamilton asserts that his Fourteenth Amendment rights were violated when defendants, (1)

improperly conducted his disciplinary rehearing, (2) failed to notify him of the death of his

son, and (3) inappropriately placed him in CSU.

Defendants move for summary judgment on the grounds that (1) there is no merit to

Hamilton's HIPPA, RLUIPA, or constitutional claims; (2) defendants Gonzales, Slesky,

Parisi, Genovese, and Davis were not personally involved; and (3) defendants are entitled

to qualified immunity.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any

material fact if supported by affidavits or other suitable evidence and the moving party is

entitled to judgment as a matter of law. The moving party has the burden to show the

absence of disputed material facts by informing the court of portions of pleadings,

depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the

case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the

non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue

for trial. The non-moving party must do more than merely show that there is some doubt or

speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could

find in favor of the non-moving party for a court to grant a motion for summary judgment.

Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

### C. First Amendment

#### 1. Retaliation

Hamilton contends that defendants disclosed his confidential medical information in retaliation for filing grievances.  To establish a claim for retaliation, a plaintiff must first demonstrate that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone."  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008) (citing Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)).

Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. Id.  Conclusory allegations alone are insufficient.  Id. (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983).

In this case, Hamilton has failed to demonstrate facts sufficient to support a retaliation claim.  Filing grievances is an activity protected by the First Amendment.  However, as discussed infra, there is no evidence to support the contention that defendants disclosed any medical information as retaliation rather than for proper purposes.  To investigate effectively and thoroughly the grievances Hamilton submitted concerning the medical treatment which he received, the staff and inmate representatives needed to view his medical records to assess whether there was validity to his claim.  Docket No. 58-2 at 33; J. Smith Decl. ¶¶ 28-30; Hamilton Dep. at 38-39.  When viewing the facts in the light most favorable to Hamilton, no evidence has been presented to support a claim that any disclosure was motivated by retaliation.

Accordingly, defendants' motion should be granted on this ground.


### 2. Denial of Access to Courts

"It is now established beyond a doubt that prisoners have a constitutional right of access to the courts."  Bounds v. Smith, 430 U.S. 817, 821 (1977).  "Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."  Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003).  In order to state a claim of denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a

18

plaintiff's] efforts to pursue a legal claim.'" Id. (citing Monsky v. Moraghan, 127 F.3d 243,

247 (2d Cir. 1997) (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996)).

"[R]egardless of the type of legal access claim, the plaintiff would have to show actual

harm to a legal claim . . . [and t]he cause of the injury must be the inadequacy of the

method of access." Bowe v. Barkley, No. 95-CV-247 (RSP/GJD), 1997 WL 204311, at *2

(N.D.N.Y. Apr, 15, 1997) (citing Lewis, 518 U.S. at 351). "[A]n isolated incident of mail

tampering is usually insufficient to establish a constitutional violation . . . . Rather, the

inmate must show that prison officials regularly and unjustifiably interfered with the

incoming legal mail." Id. (citations omitted); see also Washington v. James, 782 F.2d 1134,

1139 (2d Cir. 1986) (explaining that an action may not give rise to damages if there was "no

showing . . . that the inmate's right of access to the courts was chilled or the legal

representation was impaired."); Morgan v. Montanye, 516 F.2d 1367, 1371 (2d Cir. 1975)

(holding that a single instance of mail tampering which did not lead the plaintiff to suffer any

damage was insufficient to support a constitutional challenge).

Defendants allegedly precluded Hamilton from attending a court proceeding

telephonically.  Docket No. 58-2 at 11.  The failure to appear resulted in a dismissal of the

case.  Id.  However, this dismissal was without prejudice and permitted reinstated at any

time.  Docket No. 5105 at 217; Docket No. 58-2 at 8.  Therefore, Hamilton has failed to

show that he suffered an actual injury.  At best, he has suffered a delay in the resolution of

the ongoing legal proceedings, but he was not prohibited from re-instituting the proceeding

and carrying it forward to conclusion.  Therefore, defendants' motion for summary judgment

as to this claim should be granted on this ground.

Additionally, Hamilton contends that defendants interfered with the delivery to him of

Mathis' affidavit and legal papers from Brooklyn Law School.  Docket No. 58-4 at 30-38.

First, Hamilton only alleged one instance involving mail from the law school, which is

insufficient to establish a First Amendment violation.  See Davis v. Goord, 320 F.3d 346,

351 (2d Cir. 2003) ("[A]n isolated incident of mail tampering is usually insufficient to

establish a constitutional violation . . . . Rather, the inmate must show that prison officials

regularly and unjustifiably interfered with the incoming legal mail.").  Furthermore, Hamilton

eventually received the paperwork from the law school which indicated that they had

previously assessed Hamilton's case in 2002 and determined that there was no assistance

which the law school could provide.  Docket No. 58-3 at 5.  Thus, even viewing Hamilton's

allegations in the light most favorable to him, he had already received notice that the law

school would not assist him in his case and he suffered no actual injury.  See Gonzalez-

Cifuentes v. Torres, No. 04-CV-1470 (GLS/DRH), 2007 WL 499620, at *6 (N.D.N.Y. Feb.

13, 2007) (stating that plaintiff "identifies no particular case or claim which was impeded or

how any defendant's conduct impeded his litigation of a claim or defense [and h]e has thus

failed sufficiently to allege any actual injury from this alleged incident, much less that [the]

conduct was deliberate and malicious.") (internal citations and quotations omitted).

Thus, defendants' motion for summary judgment should be granted on this ground.

    However, the alleged denial of Mathis' affidavit yields a different result.  When Hamilton

was sent the affidavit, he was on mail watch.  J. Smith Decl. ¶ 6.  Viewing the facts in the

light most favorable to Hamilton, defendants received the affidavit, reviewed it, and were

obligated either to forward it to Hamilton or return it to the sender.  Am. Commpl. ¶ 35;

Hamilton Dep. at 32-33.  The delivery of mail to Hamilton stopped multiple times at the

second stage of review.  Am. Compl. ¶ 35.  As Hamilton was never given the Mathis

affidavit nor was Esters instructed on how to resend the affidavit to comply with DOCS regulations, a question of fact is raised as to whether defendants intentionally interfered with Hamilton's ability to receive the exculpatory evidence in the Mathis affidavit.  While it is unclear whether the affidavit would have altered the outcome of the proceeding, viewing the evidence in the light most favorable to Hamilton, it reasonably likely that it would have. Thus, if proven, these repeated incidents of seizing the Mathis affidavit rather than delivering it or returning it  constitute more than mere negligence and indicate intentional interference sufficient to raise a material question of fact.  See generally Holmes v. Grant, No. 03-CV-3426 (RJH/RLE),  2006 WL 851753, at *12 (S.D.N.Y. Mar. 31, 2006) ("Mere negligence resulting in the loss of legal papers,. . . does not state an actionable claim [as] plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts . . . [such as allegations] that the defendants deliberately stole his legal papers.") (internal quotations and citations omitted). Therefore, defendants' motion for summary judgement should be denied on this ground as to Maly for his failure to either deliver or return the mail and Smith for alleged negligent supervision and the procedures followed with respect to such packages but granted as to all other defendants.

### 3. Religious Meals

Hamilton alleges that his First Amendment right to the free exercise of his religion was violated when defendants failed to provide him with kosher meals which were also low in sodium and cholesterol as required by his therapeutic diet.

"The First Amendment . . . guarantees the right to the free exercise of religion."  Johnson v. Guiffere, No. 04-CV-57 (DNH), 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (citing Cutter v. Wilkinson, 544 U.S. 709, 719 (2005).  "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."  Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)).   This right "is not absolute or unbridled, and is subject to valid penological concerns . . . ."  Johnson, 2007 WL 3046703, at * 4.

The Free Exercise Clause extends "into other aspects of prison life including . . . that of an inmate's diet . . . ."  Id.  The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples . . . ."  Ford, 352 F.3d at 597 (citations omitted).  Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights."  McEachin v. McGuinnis, 357 F.3d 197, 203 (2d Cir. 2004).

> A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs. . . . [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision . . . [and i]n the event such a[n] interest is articulated, its reasonableness is then subject to analysis under . . . Turner . . . .

Johnson, 2007 WL 3046703, at * 4-5 (citations omitted).

In this case, defendants first contend that Hamilton's conversion to Judaism and request for kosher meals was not the result of his sincerely held religious beliefs but only his curiosity.  Defs. Mem. of Law (Docket No. 51-6) at 11-12.  To determine the sincerity of a religious belief, "the relevant inquiry is not whether, as an objective matter, the belief is accurate or logical . . . [but] . . . whether the beliefs . . . are sincerely held and whether they

22

are, in his own scheme of things, religious." Jackson v. Mann, 196 F.3d 316, 320 (2d Cir.

1999); see also Jolly v. Coughlin, 76 F.3d 468, 476 (2d Cir. 1996) (holding that a court's

inquiry is limited to "whether the belief is religious in nature").

> An inquiry any more intrusive would be inconsistent with our nation's
> fundamental commitment to individual religious freedom; thus,
> courts are not permitted to ask whether a particular belief is
> appropriate or true-however unusual or unfamiliar the belief may be.
> While it is a delicate task to evaluate religious sincerity without
> questioning religious verity, our free exercise doctrine is based upon
> the premise that courts are capable of distinguishing between these
> two questions.)

Jolly, 76 F.3d at 476.  Therefore, courts are instructed to "[v]iew . . . [the question] through

the prism of sincerity, [examining whether an inmate] . . . has produced sufficient evidence

to raise a genuine issue of material fact as to whether his religious beliefs are 'sincerely

held.'" Jackson, 196 F.3d at 320.

It is clear that Hamilton has produced sufficient evidence to raise a question of material

fact as to whether his beliefs were sincerely held as he (1) listed his religious preference as

Jewish, (2) participated in the kosher meal program, and (3) attended religious services.

See id. (finding a material issue of fact when plaintiff listed his religious preference as

Jewish, participated in kosher meal programs in several other correctional facilities, and

abstained from eating for several days to avoid eating non-kosher food).  Thus, defendants'

contention on this ground should be rejected.

Additionally, Hamilton has raised an issue of fact as to whether defendants imposed a

substantial burden on his exercise of his religious beliefs because he effectively was forced

to choose between his religion and his health.  The applicability of the substantial burden

test has been much discussed in this circuit, but as long as "an asserted claim [is not] so

bizarre, [or] clearly nonreligious in motivation, [it is] . . . entitled to protection under the Free Exercise Clause." Thomas v. Review Bd. of Ind. Employment Sec., 450 U.S. 707, 725; see also Ford, 352 F.3d at 591-93 (discussing the development of the substantial burden test in Free Exercise challenges).[15]

In this case, Hamilton has sufficiently demonstrated a First Amendment violation. Subscription to a kosher diet constitutes a material tenet of Judaism consistently found entitled to protection under the Free Exercise Clause. See, e.g., Jackson v. Mann, 196 F.3d 316, 320-21 (2d Cir. 1999) (denying government's motion for summary judgment on claim for denial of kosher meals for Jewish prisoner because, inter alia, prisoners are "entitled to a reasonable accommodation of [their] religious beliefs . . . includ[ing their] religious dietary beliefs . . . [mandating] prison officials [to] provide a prisoner a diet that is consistent with his religious scruples.") (internal quotations and citations omitted). Defendants have not challenged the validity of this religious practice. The denial of such meals on a constant basis infringes Hamilton's religious beliefs.

However, defendants did not refuse Hamilton a kosher diet but stated that they could not provide him with the low-sodium, low cholesterol kosher diet he required for his health. Defendants assert that DOCS policy required an inmate either to choose a religious or a therapeutic meal as medical staff were responsible for prescribing therapeutic meals but

---

[15] As the Supreme Court has stated, "it is not within the judicial function and judicial competence to inquire whether the petitioner . . . more correctly perceived the commands of [his] faith [as c]ourts are not arbiters of scriptural interpretation." Thomas, 450 U.S. at 715-16; see also Ford, 352 U.S. at 593 (explaining the trepidation of applying the substantial burden test because it "requires courts to distinguish important from unimportant religious beliefs, a task for which [a court is] particularly ill-suited [due to] the danger that courts will make conclusory judgments about the unimportance of the religious practice to the adherent[.]")

have no authority to provide kosher meals.  Docket No. 58-2 at 24; J. Smith Decl. ¶¶ 32-35.

Defendants advise that DOCS contracted with outside providers for the preparation and

delivery of religious and therapeutic meals and that these providers did not offer an option

for low-sodium, low-cholesterol kosher food.  Thus, DOCS lacked the ability to provide

inmates with meals which were kosher as well as low-sodium and low-cholesterol.  J. Smith

Decl. ¶¶ 32-35.  However, defendants have proffered no legitimate penological reason

other than administrative inconvenience why Hamilton could not receive a meal that was

both therapeutic and kosher.  Defendants' refusal required Hamilton to elect between his

health needs and his religious beliefs.  This burden on Hamilton's exercise of his religious

beliefs creates a question of fact on this issue.  See Bass v. Coughlin, 976 F. 2d 98, 99 (2d

Cir. 1992) (stating that "as early as 1975, it was established that prison officials must

provide a prisoner a diet that is consistent with his religious scruples" and noting that this

precedent "remains the law.") (citing Kahane v. Carlson, 527 F.2d 492, 495 (2d Cir. 1975)

and Benjamin v. Coughlin, 905 F.2d 571, 579 (2d Cir. 1990)).

   Even assuming that economic or administrative convenience constituted a legitimate

penological interest in these circumstances, forcing Hamilton to this choice here remained

unreasonable.  See Moore v. Goord, No. 01-CV-1607(GLS/GJD), Mem.-Decision & Order

(Docket No. 60) at 22-35 (N.D.N.Y. filed Sept. 28, 2005) (assessing the reasonableness of

mandating a prisoner to choose between his health and religion and finding that the weight

of the Turner factors precluded a grant of summary judgment for defendants).[16]

---

   [16] To determine reasonableness, courts must assess

   whether the challenged regulation or official action has a valid, rational
   connection to a legitimate governmental objective; whether prisoners have

Accordingly, defendants' motion for summary judgment should be denied on this ground as to Smith for his alleged failure to create a procedure for inmates with low-sodium and low-cholesterol needs to receive religious meals and granted as to all other defendants.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. CONST. amend. VIII.

### 1. Medical Treatment

The Eighth Amendment provision against cruel and unusual punishment includes the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted).  A prisoner advancing an Eighth Amendment claim for denial of medical care must demonstrate deliberate indifference to a serious medical need.  Wilson v. Seiter, 501 U.S.

----

alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

Salahuddin v. Goord, 467 F.3d 263, 274 (2d Cir. 2006) (citing Turner v. Safley, 482 U.S. 78, 84 (1987).  As previously noted, the challenged regulation is a product of economic and administrative convenience.  It could not be circumvented by prisoners confined to SHU as they had lost their commissary privileges and could not purchase food to supplement their diet.  Additionally, the impact on the prison staff, inmates, and prison resources was no greater than that which already existed except that an additional menu option.  The effect of offering a diet which was low-sodium, low-cholesterol, and kosher would have had a de minimis effect on DOCS as each inmate had to be provided with a meal and these changes would only involve a small percentage of inmates.  Thus, the DOCS policy fails the reasonableness determination.

294, 297 (1991); Hathaway, 37 F.3d at 66.  More than negligence is required "but less than conduct undertaken for the very purpose of causing harm."  Hathaway, 37 F.3d at 66.  The test for a § 1983 claim is twofold.  First, the prisoner must show that there was a sufficiently serious medical need.  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Farmer v. Brennan, 511 U.S. 825, 844 (1994).

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance, 143 F.3d at 702).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally

interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104,

(1976).  "Mere disagreement over proper treatment does not create a constitutional claim,"

as long as the treatment was adequate. Id. at 703.  Thus, "disagreements over medications,

diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for

specialists . . .  are not adequate grounds for a § 1983 claim." Magee v. Childs, No. 04-CV-

1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006).  Furthermore,

allegations of negligence or malpractice do not constitute deliberate indifference unless the

malpractice involved culpable recklessness.  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d

Cir. 1996).

### a. Mental Health Treatment

"Treatment of mental disorders of mentally disturbed inmates is . . . a serious medical

need" as contemplated by Estelle.  Guglielmoni v. Alexander, 583 F. Supp. 821, 826 (D.

Conn. 1984).  Thus, Hamilton's contentions that he had a history of suicidal thoughts,

including the evening he reported to Shawangunk, are sufficient to raise a question of fact

as to a serious medical need.  Am. Compl. ¶ 21; Hamilton Dep. at 19-20.

However, Hamilton has failed to demonstrate facts sufficient to support a finding of

deliberate indifference.  Hamilton underwent a mental health examination upon his arrival at

Shawangunk and, in defendant Skies' professional opinion, further observation was not

necessary because Hamilton was not displaying harmful tendencies despite his statements.

Skies Aff. ¶ 11.  Hamilton testimony that he had never attempted suicide despite his

depression and suicidal thoughts corroborates this evidence.  Hamilton's claim here

reduces to a disagreement over the course of treatment Hamilton underwent.  This is

insufficient to establish a claim under the Eighth Amendment.  Because Hamilton received an entrance interview and Skies appropriately evaluated him, the record is devoid of any evidence that Skies was either deliberately indifferent or intentionally delayed access to care or treatment options.  Hamilton's conclusory allegations are insufficient to withstand a motion for summary judgment.

Accordingly, defendants' motion for summary judgement on this ground should be granted.

### b. Hepatitis A

Hamilton also contends that his Eighth Amendment rights were violated when defendants refused to treat his Hepatitis A.[17]  Am. Compl. ¶ 23; Hamilton Dep. at 30-32. First, it does not appear that Hamilton was suffering from any severe symptoms which would render his Hepatitis a severe medical condition.  However, even viewing the facts in the light most favorable to Hamilton and regardless of the fact that asymptomatic Hepatitis A may not constitute a serious medical condition, Hamilton has failed to raise an issue of fact whether defendants were deliberately indifferent.  No treatment exists for Hepatitis A,

---

[17] "Hepatitis A is a contagious liver disease . . . [that] can range in severity from a mild illness lasting a few weeks to a severe illness lasting several months.  Hepatitis A is usually spread when a person ingests fecal matter . . . from contact with objects, food or drinks contaminated by the feces . . . of an infected person."  http://www.cdc.gov/hepatits/A/aFAQ.htm.  Hepatitis is generally spread when a person does not properly wash his or her hands and then handles food or other objects.  Id.  Once an individual recovers from Hepatitis A, the body develops protective antibodies for life, and the individual can never be infected again.  Id.  Thus, "[t]here are no special treatments for hepatitis A.  Most people . . . will feel sick for a few months before they begin to feel better.  A few people will need to be hospitalized . . . [R]est, adequate nutrition, and fluids" are the recommended treatment.  Id.

the disease must run its course, and the individual will never again be infected by the disease.  It is unclear what medical intervention Hamilton contends that defendants should have undertaken, but , again, the basis of Hamilton's claim here is a dispute over the medical treatment rendered by defendants.  Because there was no known treatment or cure for Hepatitis A and in the absence of any demonstrated treatment offered by Hamilton, there can be no dispute that defendants acted pursuant to generally accepted medical guidelines.  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

Therefore, defendants' motion for summary judgment on this ground should be granted.

### c. Substance Abuse

To the extent that Hamilton attempts to assert that defendants improperly dealt with his addiction because they did not mandate substance abuse treatment, it is noted that "[t]he claim to a constitutional right to treatment for narcotics addiction has no basis in either the provisions of the Constitution or the decisions of the courts . . . ."  Smith v. Follette, 445 F.2d 955, 961 (2d Cir. 1971); see also Doe v. Goord, No. 04-CV-570 (GBD/AJP), 2005 WL 3116413, at *16 (S.D.N.Y. Nov. 22, 2005).  Thus, defendants' motion for summary judgment should be granted on this ground.

### d. Confidentiality

Hamilton has alleged that defendants' disclosure of his medical records constituted a deliberate indifference to his serious medical needs.  As previously discussed, Hamilton's Hepatitis A was not a serious medical need.  Additionally, while high blood pressure and

cholesterol may require medical treatment, they do not substantially affect an individual's quality of life or leave an individual in pain and agony.  Thus, these ailments, which are controllable with medication, without more serious indications of decline or deterioration, does not warrant Eighth Amendment protection.

However, even if the conditions reflected in Hamilton's records constituted serious medical needs, the disclosure of that information to staff and inmate representatives did not constitute malicious interference or deliberate indifference.  The disclosures were necessary to investigate the pending grievances to determine their validity.  The disclosures were limited in scope and purpose and, at most, could be categorized as negligent if others viewed them.  As previously discussed, negligent behavior is not actionable under § 1983. Hathaway, 99 F.3d at 553.[18]

---

[18] Claims surrounding disclosure of confidential medical information have been analyzed under both the Eighth and Fourteenth Amendments.  See generally Rodriguez v. Ames, 287 F. Supp. 2d 213, 218-221 (S.D.N.Y. 2003).  Liberally construing the complaint, Hamilton has also alleged a Fourteenth Amendment violation pertaining to the disclosure of his medical records.

As of 1999, prisoners retained a right to privacy for medical information unless (1) that disclosure was reasonably related to legitimate penological interests or (2) the information contained within the medical records was not the type of sensitive medical information contemplated by the courts for constitutional protection.  See Powell v. Schriver, 175 F.3d 107, 111-13 (2d Cir. 1999); see also Rodriguez v. Ames, 287 F. Supp. 2d 213, 219-20 (W.D.N.Y. 2003) (upholding Fourteenth Amendment protection in cases where the prisoner "has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence," or where the information "spread through 'humor or gossip.'") (quotations omitted); Webb v. Goldstein, 117 F. Supp. 2d 289, 298-99 (E.D.N.Y. 2000) (dismissing a Fourteenth Amendment claim because the prisoner "has not alleged that his prison records contained the sort of sensitive medical information at issue in . . . Powell."); Khalfani v. Sec., Dep't of Veterans Affairs, No. 94-CV-5720 (JG), 1999 WL 138247, at *6 (E.D.N.Y. Mar. 10, 1999) ("The records at issue in this case contained rather mundane information regarding [plaintiff]'s tendon avulsion, his physical therapy and limitations on his ability to work-not the type of deeply personal information that was at issue in prior cases.").

Therefore, defendants' motion for summary judgment in this respect should be granted.

### e. Water Treatment

Liberally construing the amended complaint, Hamilton also contends that defendants' treatment of the water left its saline content at dangerously high levels, jeopardizing his high blood pressure and cholesterol and leading to neurological damage.  As discussed above, Hamilton's high blood pressure and cholesterol was well monitored and controlled with medication.  Thus, his conclusory assertions, without more, are insufficient to establish a serious medical condition.  In the same vein, Hamilton has offered no proof of any neurological conditions he has suffered as a result of the water.  Hamilton Dep. at 135. Conclusory allegations are insufficient to withstand a motion for summary judgment.

Additionally, to the extent that defendants treated the water, they neither did so in a deliberately indifferent manner.  The water readings, as confirmed by state agencies regularly checking the water, indicate that the facility was appropriately purifying the water and that it was within state-mandated specifications.  Docket No. 51-5 at 229.  Hamilton has offered no evidence to the contrary.  Thus, the record demonstrates that defendants' water treatment nullified and eradicated potential toxins.  Their efforts were tested, confirmed, and authenticated by state agencies also responsible for providing potable water.  J. Smith Decl. ¶ 22; Docket No. 51-5 at 235; Docket No. 53-3 at 64-68.

---

Here, information surrounding Hamilton's high blood pressure and cholesterol and previous Hepatitis A infection are not the kind of facts expected to invoke discrimination, intolerance, or violence.  Additionally, the disclosures were made in conducting an investigation of Hamilton's grievance, a legitimate penological interest.  Accordingly, to the extent that Hamilton has alleged a Fourteenth Amendment claim, it is without merit.

Therefore, defendants' motion on this ground should be granted.


## 2. Living Conditions

Hamilton alleges that he was confined in inhumane conditions in violation of the Eighth

Amendment. "The Constitution does not mandate comfortable prisons but neither does it

permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison

and the conditions under which he is confined are subject to scrutiny under the Eighth

Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1970); see also Johnson v. Smith,

No. 03-CV-1050 (FJS/DEP), 2006 WL 1843292, at *8 (N.D.N.Y. June 29, 2006).  As with

other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and

subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted).

Thus, "[c]onditions of confinement only constitute an Eighth Amendment violation if they

involve the deprivation of a single identifiable human need or denial of the minimum

civilized measure of life's necessities, and the defendants' state of mind was one of

deliberate indifference to that deprivation." Johnson, 2006 WL 1843292, at *9 (citations

omitted).

The objective prong can be satisfied by

> conditions of confinement . . . [which] in combination [constitute an
> Eighth Amendment violation] when each would not do so alone . . .
> [such as] when the conditions have a mutually enforcing effect that
> produces the deprivation of a single, identifiable human need such
> as food, warmth, or exercise – for example, a low cell temperature
> at night combined with a failure to issue blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted).

However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and

unusual punishment when no specific deprivation of a single human need exists." Id. (citing Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate health or safety" Farmer, 511 U.S. at 834 (citations omitted).

In this case, Hamilton has alleged facts sufficient to satisfy the objective prong of the analysis concerning the water and ventilation at Upstate.  The objective prong is satisfied as to the contaminated water claim because multiple inmates have corroborated Hamilton's complaints of (1) non-potable water, (2) the refusal of DOCS to provide inmates with bottled water, and (3) the inability of inmates in SHU  to purchase bottled water from the commissary.  Am. Compl. ¶ 43; Docket No. 58-5 at 12, 13, 16, 22, 25.  If proven, these facts, in combination, are separately, suffice to constitute a constitutional violation as they result in the deprivation of a single, identifiable human need, fresh water fit for consumption.

Additionally, the objective prong is satisfied as to the ventilation claim because multiple inmates have corroborated Hamilton's complaints of (1) poorly or non-functional ventilation units, (2) poor air quality and breathing conditions, (3) poor cleaning and sanitary services to clean the resulting dust which was not properly circulated from the cells.  Am. Compl. ¶ 44; Docket No. 58-3 at 13-50.  If proven, these facts, in combination, suffice to constitute a constitutional violation as they result in the deprivation of a single, identifiable need, air with a quality which is breathable and does not result in nose bleeds, headaches, and colds.

However, Hamilton has not offered evidence sufficient to satisfy the objective prong of the analysis concerning the lights that remained on in SHU and the growth of mold in the recreation areas.  When Hamilton testified concerning the lights, he admitted that the claim was dramatic and overstated.  Hamilton Dep. 141-42.  This claim, as well as the reference

34

to mold, relate at best to the general living conditions.  Additionally, Hamilton does not articulate how this constant lighting or growth of mold resulted in the deprivation of an identifiable human need.  Even if it could be said that Hamilton satisfied the objective prong, he has not offered facts sufficient to satisfy the subjective element.

In any event, Hamilton has not shown in any instance that defendants possessed the requisite culpable state of mind.  Defendants did not disregard the multiple prisoner complaints.  As demonstrated by the water tests, memoranda circulated throughout the prison, and correspondence with Hamilton, defendants were constantly assessing the quality of the water and air.  J. Smith ecl. ¶¶ 10-11, 22; Docket No. 51-5 at 235, 245; Docket No. 53-3 at 64-68; Docket No. 58-3 at 51.  Additionally, the windows needed to remain closed during the winter months to retain a comfortable temperature for inmates and staff and the ventilation system was, therefore, regularly inspected.  Docket No. 51-1 at 245; Docket No. 58-3 at 51; J. Smith Aff. ¶¶ 10-11; Hamilton Dep. at 36.  Furthermore, the lights remained on in the gallery for inmate safety as Hamilton's gallery housed particularly dangerous inmates.  Hamilton Dep. 56-58.  Finally, with all of the actions taken by defendants, any residual conditions which resulted at worst from defendants' negligence and not from any conscious and deliberate disregard for the inmates' health and safety.  As previously stated, negligence is insufficient to sustain an Eighth Amendment claim.  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

Accordingly, defendants' motion for summary judgment on this ground should be granted.

35

**F. Fourteenth Amendment**

**1. Due Process**

Hamilton contends that defendants violated his due process rights by refusing to allow him to call witnesses in his rehearing, failing to notify him of the death of his son, and improperly placing him in CSU.  Additionally, liberally construing the amended complaint, it appears that Hamilton contends that Maly, the hearing officer, was biased.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life.  Id. at 484; Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a SHU confinement alone is insufficient to establish an atypical and significant deprivation.  The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in SHU as well as "the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population" are to be considered.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y.1998) (citing Brooks v. DiFasi, 112 F.3d 46, 49 (2d Cir.1997)).

### a. Disciplinary Hearing and Rehearing

### i. Length of Incarceration in SHU

The Second Circuit has held "that a sentence of one year in SHU was a sufficient length to be atypical under <u>Sandin</u>."  <u>Gates v. Selsky</u>, No. 02-CV-496, 2005 WL 3132725, at *5 (W.D.N.Y. Nov. 22, 2005) (<u>citing</u> <u>Sims v. Artuz</u>, 230 F.3d 14, 23 (2d Cir. 2000)).  As Hamilton ultimately served twelve months in SHU, the duration of his SHU confinement suffices to create an issue of fact on this issue.  Am. Compl. ¶ 26.

### ii. Biased Hearing Officers and Prohibition on Calling Witnesses

Prisoners have a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings.  <u>See, e.g.</u>, <u>Sira v. Morton</u>, 380 F.3d 57, 69 (2d Cir. 2004).  However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges . . .  [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts."  <u>Allen v. Cuomo</u>, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted).   While the Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] . . ," the Second Circuit has held that the test is whether there was "'reliable evidence' of the inmate's guilt."  <u>Luna v. Pico</u>, 356 F.3d 481, 487-88 (2d Cir. 2004); <u>see also</u> <u>Superintendent, Mass. Corr. Inst. v. Hill</u>, 472 U.S. 445, 455 (1985).

To the extent that Hamilton alleges that he was not provided with impartial hearing officers, nothing in the hearing transcripts or either parties' submissions indicate that Davis or Maly was biased in any regard.  Additionally, the findings produced during the

37

investigations and drug tests leading to the misbehavior reports, the regulations in question, and the information upon which Davis and Maly relied all serve as reliable evidence supporting Hamilton's convictions and sentences.  Selsky Decl. ¶ 8; Docket No. 58-3 at 53.

Additionally, Hamilton's amended complaint alleges that he was precluded from calling additional witnesses during his hearings.  "It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity."  Scott v. Kelly, 962 F.2d 145, 146-47 (2d Cir. 1992) (internal quotations and citations omitted); see also Richardson, 833 F. Supp. at 152.  However, Mathis was no longer incarcerated but was specifically identified and allegedly possessed exculpatory evidence regarding Hamilton's innocence.  It appears that Maly's refusal to call him as a witness was unjustified.  Mathis Aff. ¶¶ 2, 4, 6; Hamilton Dep. at 96-98, 121-23.  Furthermore, it appears that Hamilton has raised a question of fact as to the refusal to call a representative from the substance abuse program to provide mitigating evidence.

Thus, defendants' motion should be denied concerning Hamilton's claim against Maly and Selsky for refusing to allow Hamilton to call Mathis and substance abuse program representatives as witnesses but should otherwise be granted as to all other defendants.


### b. Notification of Death in the Family

"It is well-settled that there is no constitutionally protected liberty or property interest in attending the funeral of a family member."  Roman v. Donelli, No. 06-CV-1071 (GLS/GJD), 2007 WL 2993825, at *4 (N.D.N.Y. Oct. 10, 2007).  Therefore, Hamilton had no constitutional right to the notification of or attendance at his son's funeral.

Additionally, while the "state may create liberty or property interests that are not

conferred by the constitution . . . , [the creation of such interests] must use explicitly

mandatory language, must place substantive limitations on official discretion, and must

require that a particular result is to be reached upon the finding of substantive predicates."

Id. (internal quotations and citations omitted).

> The authority for deathbed and funeral visits is articulated in section 113 of the New York Corrections Law [and] . . . simply states that the commissioner of correctional services **"may permit"** inmates to attend funerals of certain family members or to visit the individual if "death be imminent." The statute further provides that the power to grant these visits will be governed by rules and regulations promulgated by the commissioner. There is **no mandatory language** in this statute that would confer a liberty interest in being afforded the opportunity to go on either one of these types of visits. . . . [Additionally t]he notification of the death . . . of an inmate's family member is governed by [DOCS] Directive No. 4206 . . . [which] also shows that there is **no mandatory language** in that directive that would assure the approval of a deathbed or funeral visit if certain substantive criteria were met. . . . [T]he visit is contingent upon both verification of relationship **and Superintendent approval**. There is no mandatory language indicating that the Superintendent must approve any type of visit. Thus, no liberty interest is created by the statute or directives . . . and [b]ecause there was no liberty interest created, [Hamilton's] due process claim must fail.

Id. (internal quotations and citations omitted) (emphasis in the original).

Thus, Hamilton had no protected liberty interest. Additionally, to the extent that

Hamilton alleges that defendants did not comply with the DOCS directive in conducting an

adequate investigation into his relationship to his son, Hamilton neither declared Napper as

his son in his personal papers filed at the facility nor did Napper declare Hamilton to be his

father when he visited the prison. Hamilton Dep. at 124-26, 128-29. Therefore, at best,

defendants were negligent in their investigation of Hamilton's relationship to Napper which

is insufficient to establish a constitutional violation. Roman, 2007 WL 2993825 at *6.

Accordingly, defendants' motion as to this claim should be granted.


### c.  Placement in CSU

Hamilton contends that his placement and subsequent hearings affirming the

appropriateness of his assignment to CSU violatied his due process rights.  However,

Hamilton has "no liberty interest . . . in remaining free from confinement in the CSU."

Frazier v. Coughlin, 81 F.3d 313, 318 (2d Cir. 1996).

> [I]nmates in the CSU are confined to their cells for the same
> amount of time per day as inmates in the general prison population.
> Moreover, . . . the only substantive differences between
> confinement in the CSU and in the general prison population are (i)
> that prisoners in the CSU are ineligible for certain prison jobs, and
> (ii) that additional corrections officers may be assigned to the CSU.

Id.

Additionally, to the extent that Hamilton alleges that this placement deprived him of his

constitutionally protected right to engage in certain types of employment, that argument also

fails.  First, "New York law does not give a prisoner any statutory, regulatory or precedential

right to his prison job . . . [thus] the State commissioner or prison officials may provide jobs

for prisoners," but no liberty or property interest results.  Gill v. Mooney, 824 F.2d 192, 194

(2d Cir. 1987).  Moreover, inmates have no constitutional right to any particular position or

employment.  Hodges v. Jones, 873 F. Supp. 737, 745 (N.D.N.Y. 1995) (citations omitted).

Finally, since Hamilton failed to establish a protected liberty interest in remaining free from

confinement in CSU, no claim lies for denial of due process.  Frazier, 81 F.3d at 318.

Accordingly, it is recommended that defendants be granted summary judgment as to

any claim on this ground.

### G. RLUIPA Claim

The RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1.  In a RLUIPA claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.  The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006).

As discussed above in subsection C(3), Hamilton has raised questions of fact as to whether defendants substantially burdened his religious beliefs.  Defendants have failed to offer facts sufficient to satisfy their burden of identifying a legitimate penological interest.  Accordingly, defendants' motion for summary judgment on this ground should be  denied.

### H. HIPAA Claim

HIPAA creates a monetary remedy for the wrongful disclosure of medical information. 42 U.S.C. § 1320d-6.  However, HIPAA "does not confer a private cause of action to any particular class of individuals . . . [or] either explicitly or implicitly, confer to private individuals a right of enforcement."  Barnes v. Glennon, No. 9:05-CV-0153 (LEK/RFT), 2006 WL 2811821 at *5 (N.D.N.Y. Sept. 28, 2006) (citations omitted).  Furthermore, "HIPAA provides for no federal cause of action; instead, HIPAA provides for an enforcement

mechanism for the Secretary of Health and Human Services [HHS]."  Id. at *6 (internal

quotations and citations omitted).  Therefore, Hamilton cannot sustain his HIPAA claim

since there is no private cause of action granted by the statute.  Hamilton's only recourse

through this statute is to request the State of New York or the Secretary of HHS to bring the

action on his behalf.

Accordingly, defendants' motion for summary judgment on this ground should be

granted.


## I. Personal Involvement

Defendants contend that Hamilton has failed to establish the personal involvement of

defendants Gonzalez, Selsky, Genovese, and Davis.  "'[P]ersonal involvement of

defendants in alleged constitutional deprivations is a prerequisite to an award of damages

under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of

Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held

liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72,

74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally

involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation,
> (2) the defendant, after being informed of the violation through a report or
> appeal, failed to remedy the wrong, (3) the defendant created a policy or
> custom under which unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom, (4) the defendant was grossly
> negligent in supervising subordinates who committed the wrongful acts, or (5)
> the defendant exhibited deliberate indifference to the rights of inmates by
> failing to act on information indicating that unconstitutional acts were
> occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

323-24 (2d Cir. 1986)).

## a. Gonzalez

Gonzalez was DOCS Deputy Counsel.  Am. Compl.  Viewing the record on this motion in the light most favorable to Hamilton, Gonzalez' only personal involvement with Hamilton was as the author of the letter to the Kings County Family Court requesting that Hamilton be allowed to appear telephonically.  Docket No. 51-5 at 221.  Pursuant to the letter's request, Hamilton was allowed to and did appear telephonically at the date and time arranged by Gonzalez. Am. Compl. ¶ 20.  The case was adjourned, although Gonzalez had no involvement or reason to know about the resolution of those proceedings or subsequent developments.  Even when construing the amended complaint in the light most favorable to Hamilton, the record contains no other factual basis for finding personal involvement by Gonzalez.  There likewise exists no basis in the record to find that Gonzalez negligently supervised any subordinate, created a hiring or retention policy which allowed constitutional violations to continue, or was grossly negligent in managing subordinates.

Accordingly, defendants' motion for summary judgment in this respect should be granted as to Gonzalez.

## b. Genovese

Genovese, a physician, was involved in the provision of inmate health care and was able to prescribe therapeutic meals to inmates.  However, she had no authority to provide an inmate with a religious meal or make a religious meal available to an inmate.   Genovese

Decl. ¶ 6. Additionally, as a physician, Genovese had no authority to change DOCS policies and procedures for prescribing special inmate diets. See Hatzfield v. Goord, No. 04-CV-159, 2007 WL 700961, at *3 (N.D.N.Y. Feb. 28, 2007) (dismissing claims against a prison superintendent as there were no allegations that he had the power to create or to terminate the policy in question). Even construing the amended complaint in the light most favorable to Hamilton, any conclusory allegations that Genovese could prescribe both a religious and a therapeutic diet would still lack any factual basis. Additionally, there exists no basis in the record to find that there was any negligent supervision by Genovese, she created a hiring or retention policy which allowed constitutional violations to continue, or she was grossly negligent in managing subordinates.

Accordingly, defendants' motion for summary judgment in this respect should be granted.

### c. Selsky

Selsky, DOCS Director of SHU, directly reviewed and ruled on three disciplinary convictions which form the basis of Hamilton's due process claims. Selsky Decl. ¶¶ 8-10. "[A]ffirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." Manley v. Mazzuca, No. 01-CV-5178 (KMK), 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) (citing Foreman v. Goord, No. 02-CV-7089 (SAS), 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement.")). However, where a supervisory official receives,

reviews, and responds to a prisoner's complaint, personal involvement may be found.  See Bodie, 342 F. Supp. 2d at 203 (citations omitted).

In this case, the record is undisputed that Selsky was a supervisory official.  While personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results.  Selsky was intimately involved with the hearings and rehearing which gave rise to Hamilton's due process claims as Selsky was the individual who signed all administrative findings and ordered the rehearing of Hamilton's disciplinary proceedings.  This suffices to raise questions of fact as to Selsky's personal involvement.

Accordingly, defendants' motion for summary judgment in this respect should be denied.


### d. Davis

Davis presided as the hearing officer at Hamilton's first disciplinary proceeding.  Davis' finding that Hamilton was guilty and the sentence imposed were reversed by Selsky and the charge was remanded for a rehearing.  The rehearing was held before a different hearing officer.  Selsky Decl ¶¶ 8-9; Docket No. 58-3 at 53.  As the hearing officer, Davis was directly involved in the hearing which is the subject matter of Hamilton's claims of a due process violation. Accordingly, defendants' motion for summary judgment in this respect should be denied.


### J. Qualified Immunity

Defendants claim that even if plaintiffs' constitutional claims are substantiated, they are

entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the . . . official to believe that his [or her] acts did not violate those rights."  Smith v. City of Albany, No. 03-CV-1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached concerning any of Hamilton's claims except (1) his First Amendment claims concerning the provision of his religious meals and the interference with the delivery of the Mathis affidavit prior to his disciplinary rehearing, and (2) his due process claims concerning his inability to call witnesses during his disciplinary rehearing.

As to those claims, it was clearly established by November 30, 2006 that inmates had (1) a First Amendment right to be provided with meals that conformed to their religious tenets, see Ford, 352 F.3d at 597;(2) a First Amendment right of access to the courts which

46

included access to legal mail, see David v. Goord, 320 F.3d 346, 351 (2d Cir. 2003);and (3) a Fourteenth Amendment right to a fair and impartial disciplinary hearing including the ability to call witnesses.  See Scott, 962 F.2d at 145.  Thus, accepting all of Hamilton's allegations concerning these claims as true, questions of fact exist precluding summary judgment for defendants on this ground.

Accordingly, defendants should be granted summary judgment on the ground of qualified immunity on all claims except those described above, and defendants' motion on this ground should otherwise be denied.


### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Docket No. 51) be:

1. **DENIED** as to Hamilton's:

A. First Amendment claims against Smith regarding the provision of meals which complied with both his health needs and religious tenets;

B. First Amendment claims against Smith and Maly regarding the tampering with his legal mail, specifically the Mathis affidavit;

C  Fourteenth Amendment claims against Maly and Selsky regarding the violation of his due process rights during his disciplinary rehearing where he was precluded from calling Mathis and substance abuse counselors during his presentation of evidence;

2. **GRANTED** as to as to all other claims and defendants; and

47

3. The case be **TERMINATED** in its entirety as to defendants Gonzalez, Genovese, Skies, Parisi, Chiapperino, and Davis.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  January 13, 2009
        Albany, New York

_____

David R. Homer
U.S. Magistrate Judge

48