UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DERRICK HAMILTON,

                              Plaintiff,

                                                          9:06-CV-0805
v.                                                        (GTS/DRH)

J.T. SMITH, Superintendent, Shawangunk
Correctional Facility; J. MALY, Deputy
Superintendent of Security; WILLIAM M.
GONZALEZ, Deputy Counsel; M. GENOVESE,
Medical Doctor; M. SKIES, Registered Nurse;
DONALD SELSKY, Director of Special Housing;
D. PARISI, Mail Room Clerk; F. CHIAPPERINO,
Counselor; and ELAINE DAVIS, Steward, Attica
Correctional Facility,

                              Defendants.
_____

APPEARANCES:                              OF COUNSEL:

DERRICK HAMILTON, 93-A-5631
  Plaintiff, *Pro Se*
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, New York 12589

HON. ANDREW M. CUOMO                      CHRISTINA L. ROBERTS-RYBA, ESQ.
  Attorney General for the State of New York    Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, New York 12224-0341

HON. GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

        Currently pending before the Court, in this *pro se* prisoner civil rights action filed by

Derrick Hamilton ("Plaintiff") against nine employees of the New York State Department of

Correctional Services ("Defendants") pursuant to 42 U.S.C. § 1983, are the following: (1)

Defendants' motion for summary judgment (Dkt. No. 51); (2) United States Magistrate Judge

David R. Homer's Report-Recommendation recommending that Defendants' motion be granted

in part and denied in part (Dkt. No. 60); (3) Plaintiff's Objections to the Report-

Recommendation (Dkt. No. 67); and (4) Defendants' Objections to the Report-Recommendation

(Dkt. No. 66).  For the reasons set forth below, the Report-Recommendation is accepted and

adopted as modified, and Defendants' motion is granted in part and denied in part.

## I.    RELEVANT BACKGROUND

On June 28, 2006, Plaintiff filed his Complaint asserting claims against the following

seven (7) employees of Department of Correctional Services ("DOCS"): (1) J.T. Smith, the

Superintendent of Shawangunk Correctional Facility (hereinafter, "Shawangunk C.F."); (2) J.

Maly, a Deputy Superintendent of Security of Shawangunk C.F.; (3) William M. Gonzalez,

Deputy Counsel of DOCS; (4) M. Genovese, a medical doctor at Shawangunk C.F.; (5), M.

Skies, a registered nurse at Shawangunk C.F.; (6) Donald Selsky, Director of Special Housing of

DOCS; and (7) D. Parisi, a mailroom clerk at Shawangunk C.F.  (Dkt. No. 1.)

On December 8, 2006, Plaintiff filed an Amended Complaint, naming two additional

Defendants to the action: (1) F. Chiapperino, a corrections counselor at Shawangunk C.F.; and

Elaine Davis, a steward at Attica Correctional Facility ("Attica C.F.").  (Dkt. No. 17.)

Generally, in his Amended Complaint, Plaintiff alleges that Defendants (1) violated his

religious rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), (2)

violated his right to medical confidentiality under the Health Insurance Portability and

Accountability Act ("HIPAA"), and (3) violated his civil rights under the First, Eighth and

Fourteenth Amendments, including his right to be free from mail tampering, deliberate

indifference to his serious medical needs, and inadequate prison conditions.  (Dkt. No. 17.)

On July 31, 2008, Defendants filed a motion for summary judgment seeking dismissal of

all claims against them, arguing that (1) Plaintiff failed to establish claims under RLUIPA,

HIPAA, and the First, Eighth and Fourteenth Amendments, (2) Plaintiff failed to allege personal

involvement against several Defendants, and (3) Defendants are entitled to qualified immunity.

(Dkt. No. 51.)

On October 20, 2008, Plaintiff submitted his response to Defendants' motion, repeating

the allegations made in his Amended Complaint.  (Dkt. No. 58.)

On January 13, 2009, Magistrate Judge Homer issued a Report-Recommendation that

recommended that Defendants' motion for summary judgment be denied as to the following

claims: (1) Plaintiff's First Amendment Claim against Defendant Smith regarding the provision

of meals which complied with both his health needs and his religious tenets; (2) Plaintiff's First

Amendment Claim against Defendants Smith and Maly regarding mail tampering; and (3)

Plaintiff's Fourteenth Amendment Claim against Defendants Maly and Selsky regarding the due

process violation that occurred during Plaintiff's disciplinary rehearing where Plaintiff was

precluded from calling certain witnesses.  Magistrate Judge Homer further recommended that all

remaining claims be dismissed and that all claims as to Defendants Gonzalez, Genovese, Skies,

Parisi, Chiapperino and Davis be dismissed for lack of personal involvement.  (Dkt. No. 60.)[1]

Familiarity with the grounds of Magistrate Judge Homer's Report-Recommendation is assumed

---

[1]       It should be noted that Defendant Davis was recommended for dismissal in the
ordering paragraph of the Report-Recommendation.  (*See* Dkt. No. 60, at 48.)  However, in
reviewing Defendant Davis's involvement in events surrounding the disciplinary proceeding,
Magistrate Judge Homer determined that Defendant Davis was directly involved in the
disciplinary hearing, which forms the basis for Plaintiff's due process claim.  (*Id.* at 45.)  Thus, it
appears that Defendant Davis was mistakenly included in the ordering paragraph recommending
dismissal.  (*Id.* at 46-47 [stating that qualified immunity would not extend to those Defendants
who were involved in the events forming the basis for Plaintiff's Fourteenth  Amendment
claim].)  As a result, the Court has included Defendant Davis in its analysis with respect to
Plaintiff's Fourteenth Amendment claim.

in this Decision and Order.

## II.    APPLICABLE LEGAL STANDARDS

### A.    Standard of Review

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[2] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir.1999).[3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted].  After conducing the appropriate review, the Court may

---

[2]        On *de novo* review, "[t]he judge may . . . receive further evidence . . . ." 28 U.S.C. § 636(b)(1)(C).  However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

[3]        *See also Vargas v. Keane*, 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report . . . [did not] redress the constitutional violations [experienced by petitioner] . . . is a general plea that the Report not be adopted . . . [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd*, 86 F.3d 1273 (2d Cir.), *cert. denied*, 519 U.S. 895 (1996).

"accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).

### B.    Standard Governing Motion for Summary Judgment

Magistrate Judge Homer correctly recites the legal standard governing a motion for summary judgment.  (Dkt. No. 60, at 16-17.)  As a result, this standard is incorporated by reference in this Decision and Order.

## III.    ANALYSIS OF CLAIMS RECOMMENDED FOR TRIAL

### A.    Plaintiff's Claim Regarding His Meals

In his Amended Complaint, Plaintiff alleges that Defendant Smith, who is the Superintendent at Shawangunk C.F., failed to provide Plaintiff with meal options that accommodate both his therapeutic dietary needs as well as his religious tenets.  (Dkt. No. 17, at 11.)  In his Report-Recommendation, Magistrate Judge Homer recommends that this claim proceed to trial because he found that there was a genuine issue of material fact as to whether there was a legitimate penological interest for Shawangunk C.F.'s failure to provide Plaintiff with meals that accommodate both his religious and dietary needs.  (Dkt. No. 60.)

In their objections, Defendants make the following four arguments: (1) "[w]hile Plaintiff claims that he requires low-sodium and low-cholesterol food, he presents absolutely no evidence aside from his speculation that the nutritional makeup of the Kosher meal (also known as a "Cold Alternative Diet" or "CAD") exceeds the sodium or cholesterol content plaintiff is recommended"; (2) "in coming to its conclusion, the Report ignored the fact that the CAD is provided to inmates who request it, due to religious reasons, through ministerial services staff and that Defendant Smith lacks control over the diet"; (3) "[w]hile the Report cites to the fact that the meals are provided to Shawangunk by outside providers, it [errs] by first agreeing that

the Department of Correctional Services ('DOCS') lacks the ability to provide inmates with meals that are kosher and low in sodium and then incredibly finds Defendant Smith liable for this lack and for not creating an acceptable alternative"; and (4) "since there was no diet meeting Plaintiff's request available and Defendant Smith did not have any personal involvement in preparing or providing special diets, the claims must be dismissed as to Defendant Smith for lack of personal involvement." (Dkt. No. 66.)

As an initial matter, the Court finds the first argument unpersuasive. In his declaration in opposition to Defendants' motion for summary judgment, Plaintiff swears that Defendant Genovese informed him that the CAD was high in sodium, and that he therefore had to change his diet. (Dkt. No. 58, Part 1, at ¶¶ 10-11.)

In addition, the Court finds the fourth argument unpersuasive. According to his declaration, Defendant Smith is the Superintendent at Shawangunk C.F. (Dkt. No. 58, Part 3, at 10.) In this capacity, he is responsible for "all aspects of facility operations." (*Id.*) Based on this general characterization, the Court finds that there is a genuine issue of material fact as to whether Defendant Smith was responsible for implementing the facility's meal menus. Accordingly, the claims against Defendant Smith should not be dismissed for lack of personal involvement.

The Court analyzes Defendants' remaining two arguments as follows.

### 1.    Defendant's Argument Regarding Plaintiff's Claim Arising Under the First Amendment's Free Exercise Clause

"The right of prison inmates to exercise their religious beliefs . . . is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere*, 04-CV-0057, 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007)

(Peebles, MJ) (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 [1987]) (other citation omitted).  "A determination of whether the refusal to permit attendance at a religious service, for example, hinges upon the balancing of an inmate's First Amendment free exercise right, against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is one of reasonableness, taking into account whether the particular act affecting the constitutional right is reasonably related to legitimate penological interests." *Guiffere*, 2007 WL 3046703, at *4 (internal quotation marks and citations omitted)

"Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals." *Id.* (citations omitted). Accordingly, "[c]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *Id.* (citation omitted).  Having said that, because of the demands of prison officials to operate prison facilities in a certain manner, "[a] free exercise claim arising from such a denial brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other hand." *Id.* (citation omitted).

When examining a plaintiff's free exercise claim, a court must undergo a three-part, burden shifting framework.  *Id.* at *5 (citation omitted).  "A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs." *Id.* (citations omitted).  "Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny." *Id.* (citations omitted).  "In the event such a penological interest is

7

articulated, its reasonableness is then subject to analysis under the test set out by the Supreme

Court in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254 (1987)." *Id*. (citations omitted).

"Under *Turner*, the court must determine whether the governmental objective underlying

the regulations at issue is legitimate and neutral, and whether the regulations are rationally

related to that objective." *Id*. (internal quotation marks and citation omitted). "The court then

asks whether the inmate is afforded adequate alternative means for exercising the right in

question." *Id*. (citations omitted). "Lastly, the court must examine the impact that

accommodation of the asserted constitutional right will have on others (guards and inmates) in

the prison." *Id*. (internal quotation marks and citation omitted). "Decisions rendered since

*Turner* have clarified that when applying this test, a court should examine the existence of

alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect

on valid penological interests." *Id*. (internal quotation marks and citations omitted).

In their motion, Defendants suggest that, because Plaintiff converted to Judaism only to

"learn about the religion" and because Plaintiff no longer practices Judaism, his beliefs were not

serious. (Dkt. No. 51, Part 6, at 14.) While the facts suggested by Defendants may be true, the

Second Circuit has encouraged "courts [to] resist the dangerous temptation to try to judge the

significance of particular devotional obligations to an observant practitioner of faith." *McEachin

v. McGuinnis*, 357 F.3d 197, 201 (2d Cir. 2004). As a result, the Court finds that Plaintiff has

satisfied his burden in the first part of the above-described, burden-shifting inquiry.

In response, Defendants argue that officials have a legitimate penological interest in

carrying out their responsibility for the daily preparation of meals for all inmates within their

control. (Dkt. No. 51, Part 6, at 14.) Defendants further argue that "[i]t is not a reasonable

demand that prison officials supply every inmate with their personal diet request for every

8

meal." (*Id.*)  As a result, the Court finds that Defendants have satisfied their burden in the second part of the above-described, burden-shifting inquiry.

Because Defendants have articulated a justification for failing to provide Plaintiff with a diet that conforms to both his religious and therapeutic needs, the focus shifts back to Plaintiff to establish, through a weighing of the *Turner* factors, that "the policy is not reasonably related to legitimate penological interests." *Guiffere*, 2007 WL 3046703, at *6.  "Such an inquiry is particularly fact-laden, and generally ill-suited for resolution on motion for summary judgment." *Id*.  Having said that, a court must also bear in mind that, "[w]hile all justifiable inferences must be drawn in the prisoner's favor with respect to matters of disputed fact, in disputed matters of professional judgment the court's inferences must accord deference to the views of prison authorities." *Furnace v. Arceo*, 06-CV-4609, 2008 WL 618907, at *7 (N.D. Cal. Mar. 3, 2008) (citing *Beard v. Banks*, 126 S. Ct. 2572, 2578 [2006]).  Therefore, "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Banks*, 126 S. Ct. at 2578.

As described above, the first *Turner* factor is whether the governmental objective underlying the regulations at issue is legitimate and neutral, and whether the regulations are rationally related to that objective.  *Turner*, 482 U.S. at 89-90.  Defendants argue, as did the defendants in *Arceo*, that two legitimate penological interests prevent them from providing [P]laintiff with a . . . diet [that satisfies both his religious and therapeutic needs]: budgetary and administrative concerns."  *Arceo*, 06-CV-4609, 2008 WL 618907, at *8.  Furthermore, as did the defendants in *Arceo*, "[i]n support of their argument, Defendants have presented [a] declaration[] attesting to the fact that all meals provided to inmates at [Shawangunk C.F.] are based on standardized menus generated by the [state]; this plan includes the [Shawangunk C.F.]

alternative-entree meals that are provided to inmates who for religious reasons choose not to eat meat [or choose to eat only Kosher products]."[4]

Under the circumstances, this Court finds, as did the district court in *Arceo* that, "[e]ven where the marginal cost and administrative burden of providing a specialized religious diet would be small or negligible, a rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns." *Arceo*, 2008 WL 618907, at *8 (citing *Shakur v. Schriro*, 514 F.3d 878, 886 [9th Cir. 2008]). For example, it is clear that a diet that complies with Plaintiff's therapeutic and religious needs cannot be prepared from any of the food menus available to Plaintiff. (Dkt. No. 53, Part 3, at 14, ¶¶ 32, 35 [Decl. of Joseph T. Smith, testifying that "there is no CAD diet which conforms to therapeutic standards [i.e., which is low in fat, cholesterol, and sodium].") "[C]onsequently, the Court finds a common-sense connection exists between [D]efendants' policy of not providing [P]laintiff with a [specialized food menu] and their legitimate budgetary and administrative concerns." *Arceo*, 2008 WL 618907, at *8. In addition, "[P]laintiff has not presented evidence that refutes the connection[.]" *Id*. As a result, the Court finds that the first *Turner* factor weighs in favor of Defendants.

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 89-90. Here, there is no record evidence that indicates that there were not alternative means for Plaintiff to exercise his right to

---

[4] In particular, Defendant Smith states, in his declaration, that Plaintiff was offered the CAD after he submitted a form to change his religious affiliation to Judaism. (Dkt. No. 53, Part 3, at 14, ¶¶ 32-33 [Decl. of Joseph T. Smith].) Defendant Smith further states that the CAD is a diet that exists on a "state wide menu" which is "supplied to Shawangunk C.F. from the Oneida Correctional Facility Food Processing Plant, or other approved, outside vendors." (*Id*. at ¶ 34.) Finally, Defendant Smith states that "there is no CAD diet which conforms to therapeutic standards [i.e., which is low in fat, cholesterol, and sodium]." (*Id*. at ¶ 32, 35.)

religious freedom. According to his own testimony, Plaintiff was given a Kosher diet that complied with the faiths of his religion. (Dkt. No. 51, Part 5, at 102-104.) In addition, Defendants have adduced evidence that (1) in addition to providing Plaintiff with the CAD, they provided Plaintiff with medications including Lipitor to manage his hypertension, which sometimes obviate the need for a low-sodium diet, and (2) "inmates are always free to augment their diet as they wish through packages and purchases at the commissary, unless such privileges have been revoked as part of disciplinary sanctions." (Dkt. No. 68, Part 3, ¶¶ 7-10 [Decl. of Maryann Genovese]; Dkt. No. 53, Part 3, at 14, ¶ 36 [Decl. of Joseph T. Smith].) Finally, Plaintiff has failed to offer any evidence that would suggest that Defendants prevented him from studying, praying, wearing whatever clothing he desired, or attending ceremonies and rituals.[5] As a result, the Court finds that the second *Turner* factor weighs in favor of Defendants.

The third *Turner* factor requires the Court to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally." *Turner*, 482 U.S. at 91. Defendants argue that providing Plaintiff with diet that conforms to both his therapeutic and religious needs will significantly impact both prison resources and prison officials, and that institutional budgetary concerns weigh in favor of maintaining the system in its current fashion. (Dkt. No. 51, Part 6, at 14.) Granted, Defendants

---

[5]     *See Arceo*, 2008 WL 618907, at *8 (noting that "the second *Turner* factor has been deemed satisfied where the prisoner retains 'the ability to participate in other significant rituals and ceremonies' of his faith, even if some aspects of religious practice are impinged upon"); *see also O'Lone*, 482 U.S. at 351-52 ("The record establishes that respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations. The right to congregate for prayer or discussion is 'virtually unlimited except during working hours,' and the state-provided imam has free access to the prison. Muslim prisoners are given different meals whenever pork is served in the prison cafeteria. Special arrangements are also made during the month-long observance of Ramadan, a period of fasting and prayer.").

have not offered any evidence that specifically describes the budgetary costs associated with adding new food options to prison menus, or other practical obstacles associated with providing a low-sodium CAD.  (*See generally* Dkt. No. 51.)  *Cf. Arceo*, 2008 WL 618907, at *9 (where defendants provided declarations showing that meal preparation at the facility "is a systematized process that involves many different departments and individuals.").

Having said that, Defendants have adduced evidence that (1) the CAD is a diet established as part of a "state wide menu," (2) the CAD is supplied by the Oneida Correctional Facility Food Processing Plant, or other approved outside vendors (presumably due in part to the special equipment and training required to prepare the CAD), and (3) no CAD has yet been created (within DOCS) that is low in fat, cholesterol, and sodium.  (Dkt. No. 53, Part 3, at 14, ¶¶ 32-35 [Decl. of Joseph T. Smith].)  Together, these facts suggest that there would be some added cost in developing a new low-sodium CAD.  Moreover, Defendants have argued that this accommodation–providing Plaintiff with a meal option outside of the state-wide menu–could have "a significant 'ripple effect' on fellow inmates," *Turner*, 482 U.S. at 90, in that such an accommodation could open the door to the creation of various specialized menus for other inmates with different therapeutic and religious needs.  (Dkt. No. 51, Part 6, at 14.)  Based on this potential "ripple effect," the Court finds that it must be "deferential to the informed discretion of corrections officials."  *Turner*, 482 U.S. at 90.  Moreover, Plaintiff has failed to offer any evidence that Defendants' position is unreasonable.[6]  As a result, the Court finds that the third *Turner* factor weighs in favor of Defendants.

The fourth *Turner* factor requires the Court to consider the existence of alternative means

---

[6]    "The prisoner-plaintiff bears the burden of proving that the disputed regulation is unreasonable."  *Giano v. Senkowski*, 54 F.3d 1050, 1054 (2d Cir. 1995).

12

of facilitating exercise of the right that have only a *de minimis* adverse effect on valid

penological interests.  "The burden is on the prisoner challenging the regulation, not on the

prison officials, to show that there are obvious, easy alternatives to the regulation."  *Arceo*, 2008

WL 618907, at *9 (citing *O'Lone*, 482 U.S. at 350 [1987]) (other citation omitted).  Here,

Plaintiff has not put forth a ready alternative to Defendants' religious-diet policy that would

accommodate his right to a religious diet at a *de minimis* cost to Defendants' legitimate

administrative and budgetary concerns.  As a result, the Court finds that the fourth *Turner* factor

weighs in favor of Defendants.

In sum, after considering each factor of the *Turner* test,[7] the Court finds that it was not

unreasonable for Defendant Smith to follow a state-wide meal menu, which did not happen to

satisfy both Plaintiff's dietary and therapeutic needs, given the legitimate penological concern of

maintaining order.  The Court makes this finding cognizant of the fact that "deference must be

accorded prison authorities' views with respect to matters of professional judgment," *Beard v.

Banks*, 126 S. Ct. 2572, 2574 (2006), understanding that "matters of professional judgment"

include selecting inmate meal menus, given the budgetary expense and potential disorder

associated with this task.[8]

As a result, the Court grants Defendants' motion for summary judgment with regard to

---

[7]    It bears noting that the four *Turner* factors must be looked at as a whole when "determining the reasonableness of the regulation at issue." *Turner*, 482 U .S. at 89.

[8]    *See Kahane v. Carlson*, 527 F.2d 492, 496 (2d Cir. 1975) (requiring, under the First Amendment, DOCS to provide "a diet sufficient to sustain the prisoner in good health without violating the Jewish dietary laws, without otherwise mandating specific items of diet"); *cf. Andreola v. Glass*, 04-CV-0282, 2008 WL 2937574, at *1 (E.D. Wisc. July 23, 2008) (expressing doubt as to whether plaintiff's claim that the Wisconsin Department of Corrections failed to "provide him with a kosher diet low in cholesterol and salt, pursuant to his doctor's orders regarding his cardiac health," established a cognizable claim under the First Amendment).

Plaintiff's claim under the First Amendment's Free Exercise Clause.

2.     **Defendant's Argument Regarding Plaintiff's Claim Arising Under RLUIPA**

"Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA") in response to the Supreme Court's holding in *City of Boerne v. Flores*, 521 U.S. 507 (1997), declaring unconstitutional the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(b)." *Marria v. Broaddus*, 200 F. Supp.2d 280, 297 (S.D.N.Y. 2002). "RLUIPA applies both to programs or activities that receive federal financial assistance and to substantial burdens on religious exercise having an effect on interstate commerce." *Broaddus*, 200 F. Supp.2d at 297 (citations omitted). "[A claim arising under] RLUIPA is an independent cause of action, with a slightly different standard and must be treated separately from the First Amendment claim." *Keesh v. Smith*, 04-CV-0779, 2007 WL 2815641, at *11 (N.D.N.Y. Sept. 25, 2007) (Mordue, J.) (citation omitted).

"Under RLUIPA, once a plaintiff produces prima facie evidence to support a free exercise violation, the plaintiff bears the burden of persuasion on whether the regulation substantially burdens the plaintiff's exercise of religion *and the state bears the burden of persuasion on all other elements*." *Broaddus*, 200 F. Supp.2d at 297 (citation omitted; emphasis added). Stated another way, "RLUIPA imposes a more exacting standard on prison officials [than does the First Amendment], requiring that any substantial burden on an inmate's exercise of religion be warranted by a compelling governmental interest, and be the least restrictive means of accomplishing that interest." *Keesh*, 2007 WL 2815641, at *11 (internal quotation marks and citations omitted). "By its terms, RLUIPA is to be construed to broadly favor protection of religious exercise." *Broaddus*, 200 F. Supp.2d at 297 (citing 42 U.S.C. §

2000cc-3[g]).

The Supreme Court has defined substantial burden as "[w]here the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Indiana Employ. Sec. Div.*, 450 U.S. 707, 717-18 (1981). Here, there is no question that forcing an inmate to choose between his therapeutic dietary needs and his religious dietary needs creates a substantial burden on Plaintiff's ability to exercise his religion. Therefore, the Court must determine whether Defendants have demonstrated that (1) the substantial burden on Plaintiff's exercise of religion was warranted by a compelling governmental interest, and (2) following the state-wide menu option was the least restrictive means of accomplishing that interest.

As the Supreme Court recently explained in its discussion of RLUIPA, "'[c]ontext matters' in the application of th[e compelling interest] standard." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 [2003]). In other words, RLUIPA should not be read "to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 723. In addition, when reviewing a claim under RLUIPA, a court must afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* (quoting Joint Statement 16699 [quoting S. Rep. No. 103-111, at 10, U.S. Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900]).

Here, the Court notes that Defendants Smith and Genovese have adduced some–albeit little–evidence in an effort to specifically establish that (1) the substantial burden on Plaintiff's

exercise of religion was warranted by a *compelling governmental interest* (e.g., in controlling costs and/or maintaining order) at Shawangunk C.F., and (2) adhering to the state-wide menu option was the *least restrictive means* of accomplishing the above-referenced compelling governmental interest.[9]  A review of the declarations of Defendants Smith and Genovese reveals why they adduced little such evidence: they argue, in pertinent part, that they lacked personal involvement in the RLUIPA violation alleged.  (*See, e.g.*, Dkt. No. 51, Part 6, at 24 [Defs.' Memo. of Law].)

Furthermore, they have adduced record evidence in support of that argument.  More specifically, Defendant Smith, the highest-ranking official at Shawangunk C.F., swears that "[t]he [CAD] menus are not created at Shawangunk.  Thus, I have no personal control over the contents of the [CAD] meals."  (Dkt. No. 53, Part 3, at 14, ¶ 34 [Decl. of Joseph T. Smith].)  Similarly, Defendant Genovese, a Clinical Physician at Shawangunk C.F., swears as follows:

---

[9]     For example, with regard to the first referenced element, Defendants have adduced evidence that (1) the CAD is a diet established as part of a "state wide menu," (2) the CAD is supplied by the Oneida Correctional Facility Food Processing Plant, or other approved outside vendors (presumably due in part to the specialized nature of the CAD), and (3) no CAD has yet been created (within DOCS) that is low in fat, cholesterol, and sodium.  (Dkt. No. 53, Part 3, at 14, ¶¶ 32-35 [Decl. of Joseph T. Smith].)  Together, these facts suggest that there would be some added cost in developing a new low-sodium CAD.  Moreover, with regard to the second referenced element, Defendants have adduced evidence that (1) in addition to providing Plaintiff with the CAD, they provided Plaintiff with medications including Lipitor to manage his hypertension, which sometimes obviate the need for a low-sodium diet, and (2) "inmates are always free to augment their diet as they wish through packages and purchases at the commissary, unless such privileges have been revoked as part of disciplinary sanctions."  (Dkt. No. 68, Part 3, ¶¶ 7-10 [Decl. of Maryann Genovese]; Dkt. No. 53, Part 3, at 14, ¶ 36 [Decl. of Joseph T. Smith].)

> As a Clinical Physician 2, I do not prescribe religious diets due to the fact that such diets are not prescribed by health care workers at DOCS. To receive a religious diet, inmates are required to complete paper work that is processed by the Ministerial Services, not the medical department. Therefore, I have never prescribed a religious diet to any inmate due to the fact that religious diets are not based on medical benefits or health criteria. . . .  In this case . . . , plaintiff was placed on a therapeutic diet on June 12, 2006.  Plaintiff's diet was a ' Controlled A' which contains enhanced fiber, but is low in fat, cholesterol , and sodium. . . .  As a [C]lincal [P]hysician 2, I am responsible solely for the prescription of therapeutic diets.  No part of my job duties require, or allows, me to actually provide the diets as they are distributed by another department. . . .  To the extent that plaintiff claims I violated his right to practice his religion, I reiterate that I at no time had [the] ability to prescribe religious diets.

(Dkt. No. 68, Part 3, ¶¶ 6, 11, 14, 15 [Decl. of Maryann Genovese].)  It should be noted that Defendant Genovese's testimony is consistent with four administrative decisions denying two of Plaintiff's grievances on the subject, which explain that, pursuant to DOCS Directive 4311, "Inmate requests for religious foods/diets[] shall not be prescribed by the health care provider." (Dkt. No. 58, Part 2, at 22, 24-26.)  Finally, it should be noted that Plaintiff has failed to adduce any admissible record evidence controverting the record evidence adduced by Defendants Smith and Genovese.

After carefully reviewing the undisputed facts in the record, and the relevant case law, the Court agrees with Defendants Smith and Genovese: they lacked personal involvement in the RLUIPA violation alleged in this action, because (as the superintendent and a physician at Shawangunk C.F.) they lacked the authority to deviate from DOCS' state-wide Kosher menu in order to design, and prepare for Plaintiff, a new Kosher menu that was low in sodium.[10]  *See*

---

[10]    Although Magistrate Judge Homer based his recommendation that Plaintiff's claims against Defendant Genovese be dismissed on this ground, Plaintiff failed to specifically challenge that recommendation in his Objections.  (*Compare* Dkt. No. 60 at 43-44 *with* Dkt. No. 67.)  As a result, this recommendation is subject only to clear-error review.  *See*, *supra*, Part II.A.

*Johnson v. Sisto*, 07-CV-1826, 2009 WL 2868724, at *6 (E.D. Cal. Sept. 2, 2009) ("Plaintiff has

presented no evidence disputing the defendants' averments that they [are not liable under

RLUIPA because they] do not create the menus and cannot order substitutions of [Rastafarian

religious] menu items, nor has he named as defendants those in [the California Department of

Corrections] responsible for establishing the system-wide religious diet plans."); *Acoolla v.

Angelone*, 01-CV-1008, 2006 WL 938731, at *13 (W.D. Va. Apr. 10, 2006) ("Because the

record indicates that decisions about [Virginia Department of Corrections] religious diets are

centralized, . . .  it is clear that officers at individual prisons have no authority to provide

[plaintiff] the relief he seeks [under RLUIPA].").[11]

The Court finds that the Second Circuit's recent decision in *Jova v. Smith*, No. 08-2816,

2009 WL 3068100 (2d Cir. Sept. 28, 2009), is distinguishable for two reasons: (1) in addition to

suing Joseph T. Smith, the plaintiffs in that case sued the DOCS Commissioner, Deputy

Commissioner for Program Services, and Director of Ministerial & Family Services; and (2)

neither the district court nor the Second Circuit in that case addressed the issue of whether

---

of this Decision and Order.  However, the Court notes that this recommendation would survive
even a *de novo* review, for the reasons stated above.

      [11]     *Cf. Agrawal v. Keim*, 06-CV-0945, 2009 WL 309990, at *2 (S.D. Ill. Feb. 9,
2009) (dismissing prisoner's RLUIPA claim that a prison chaplain did not provide him with a
Hindu vegetarian diet that contained dairy products, because "there is no evidence that [chaplain]
was personally involved in the diet decisions"); *Williams v. Miller*, 04-CV-0342, 2007 WL
2893641, at *8 (S.D. Ill. Sept. 28, 2007) (dismissing prisoner's First Amendment claim that a
prison chaplain did not provide him with a Kosher diet, because "[the chaplain] does not make
policy for [the Illinois Department of Corrections], . . ., and does not have any role in setting or
modifying an inmate's diet"); *Ghashiyah v. Wisconsin Dept. of Corr.*, 01-CV-0010, 2007 WL
2822005, at *12-13 & n.16 (E.D. Wis. Sept. 27, 2007) (dismissing prisoner's RLUIPA claim
alleging that he was not provided with a halal meal free of contact with pork, because "it is
undisputed that [none of the defendants] had any personal involvement with the food service
policies at issue in [Oshkosh Correctional Institution] and [Racine Correctional Institution]"),
*aff'd*, 278 F. App'x 654 (7th Cir. 2008).

Joseph T. Smith had the authority to design, and prepare for the plaintiffs, a new religious menu (especially one that fulfilled the plaintiffs' therapeutic dietary needs). *See Jova*, 2009 WL 3068100; *Keesh v. Smith*, 04-CV-0779, 2007 WL 2815641 (N.D.N.Y. Sept. 25, 2007).

As a result, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's RLUIPA claim.

### B.    Plaintiff's First Amendment Claim Regarding Mail Tampering

In his Amended Complaint, Plaintiff alleges that Defendants Smith and Maly confiscated legal and non-legal mail addressed to Plaintiff in violation of his First Amendment rights.  (Dkt. No. 17.)  In his Report-Recommendation, Magistrate Judge Homer recommends that this claim proceed to trial because there is a genuine issue of material fact as to whether Defendant Maly intentionally interfered with Plaintiff's ability to receive mail addressed to him (specifically, mail sent from Nicole Esters enclosing an affidavit from a former inmate, Mr. "D. Mathis"),[12] and whether Defendant Smith was negligent in his supervision of Defendant Maly and the procedures followed with respect to prison mail.  (Dkt. No. 60.)

In their objections, Defendants argue that "[t]he Report relies on conclusory allegations made by the plaintiff in finding that defendant Maly received an affidavit that was addressed to the plaintiff and failed to forward the affidavit to the plaintiff or mail it back to the sender." (Dkt. No. 66.)  Defendants further argue that "the record is void of any proof whatsoever that such an affidavit existed or was ever in the possession of defendant Maly."  (*Id*.)  In addition, Defendants argue that "plaintiff fails to offer proof that the [Mathis] affidavit was packaged in a

---

[12]    In his affidavit, Mr. Mathis claims his DOCS identification number was 93-A-6702.  (Dkt. No. 58, Part 4, at 50.)  According to DOCS' on-line "Inmate Lookup" Service, that DOCS identification number belongs to an inmate named Daniere N. Mathis.

19

way that met the criteria of the Inmate Correspondence Program as set forth in DOCS

directives."  (*Id.*)  With regard to Defendant Smith, Defendants argue that "[P]laintiff had no

personal knowledge that defendant Smith allowed defendant Maly to confiscate his mail[, and]

Plaintiff cannot establish that an investigation did not take place regarding his mail."  (*Id.*)

      According to Plaintiff, in December 2005, Nicole Saunders sent Plaintiff legal documents

by Federal Express.  (Dkt. No. 17, at ¶ 34.)  Because the documents, which never reached

Plaintiff, were assigned a tracking number, Saunders was able to determine that the documents

reached Shawangunk C.F.  (*Id.*)  According to Plaintiff, Saunders contacted the facility, and was

notified by the mail room that Defendant Maly was in possession of the documents, and that, if

the documents did not comply with facility protocol, they would be sent back to her with a letter.

(*Id.* at ¶ 35.)  However, neither Saunders nor Plaintiff ever received the documents or a letter.

(*Id.*)

      It does not seem disputed that Plaintiff, along with certain other inmates, had been placed

on mail watch at around the time that Saunders attempted to send these documents.  However,

even assuming that Plaintiff's mail was properly intercepted because it did not comply with

facility protocol (which would have justified the non-delivery of the documents to Plaintiff),

Defendants have failed to offer any explanation as to why the documents were never returned to

the sender.

      Moreover, in addition to this incident, Plaintiff's Amended Complaint (which is verified

pursuant to 28 U.S.C. § 1746, and thus has the force and effect of an affidavit for purposes of a

motion for summary judgment)[13] identifies at least three other incidents in a seven-month period,

_____

      [13]      (Dkt. No. 17, at 37.)  *See Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d.
Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to

20

prior to when Plaintiff was allegedly on mail watch, in which mail was sent to Plaintiff, but was neither received by Plaintiff or returned to the sender. (Dkt. No. 17, at 7-9; *see also* Dkt. No. 60, at 11-12.) One of the documents that Plaintiff never received (and that was never returned to sender) was Nicole Esters' first mailing of the Mathis affidavit on June 21, 2005, in which Mathis stated that his urine sample was switched with Plaintiff's urine sample, resulting in Plaintiff's positive drug test. (Dkt. No. 17, at 7; *see also* Dkt. No. 60, at 11-12.)[14]

Under the circumstances, the Court finds that there is at least a genuine issue of material fact as to whether (1) Defendant Maly tampered with Plaintiff's mail, and (2) Plaintiff suffered any harm as a result of the alleged tampering. *Brown v. Kepiec*, 06-CV-1126, 2009 WL 818959, at *4 (N.D.N.Y. Mar. 25, 2009) (Suddaby, J.) ("To prevail on a First Amendment access-to-the-courts claim based on interference with legal mail under § 1983, a prisoner must make a showing that a prison official's deliberate and malicious interference caused an actual injury, such as the dismissal of a non-frivolous legal claim."); *cf. Morgan v. Montanye*, 516 F.2d 1367, 1371 (2d Cir. 1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

The Court makes this finding with some reservation given that Plaintiff's appeal of the decision to place him in SHU was decided by Defendant Selsky *before* the two dates on which

---

oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

[14]     It appears that Plaintiff received Nicole Esters' *second* mailing of that affidavit, in early July 2005. (*Compare* Dkt. No. 17, ¶¶ 30-31 [Plf.'s Am. Compl., alleging that Defendant Maly "stole the affidavit [sent in July of 2005] and refused to provide it to Hamilton] *with* Dkt. No. 58, Part 4, at 49-51 [Plf.'s response papers, attaching letter from Plaintiff to Selsky dated 7/6/05, enclosing affidavit in question].)

Nicole Esters attempted to mail the Mathis affidavit to Plaintiff (so that Plaintiff could submit that affidavit to Selsky for consideration).[15]   It is conceivable to the Court that such an anachronism might destroy the causal connection necessary for Plaintiff to succeed on a mail-tampering claim under the First Amendment.  However, Defendants have not established that, if Plaintiff had received the Mathis affidavit during the few days after Nicole Esters mailed it on June 21, 2005, and had immediately sent it to Defendant Selsky for reconsideration of his decision of June 13, 2005, that decision would have remained the same.[16]  As a result, the Court finds that this claim survives judgment as a matter of law, on the current record.

With regard to Defendant Smith, it is true that "[he] cannot be liable solely because he held a position of authority over other defendants." *Douglas v. Smith*, 05-CV-1000, 2008 WL 434605, at *15 (N.D.N.Y. Feb. 14, 2008) (Homer, MJ).  However, liability may be imputed to Defendant Smith where his supervision amounts to gross negligence. *Murray v. Pataki*, 03-CV-1263, 2007 WL 956941, at *4 (N.D.N.Y. Mar. 29, 2007) (Kahn, J.) ("[I]f a prisoner

---

[15]     The first time that Nicole Esters attempted to mail Plaintiff the affidavit in question was on or about June 21, 2005.  (Dkt. No. 58, Part 3, at 2.)  However, Plaintiff's appeal of the April 2005 decision to place him in SHU was modified by Defendant Selsky more than a week before that attempted mailing–on June 13, 2005.  (Dkt. No. 17, at ¶ 26 [Plf.'s Verified Amended Complaint, asserting fact]; Dkt. No. 58, Part 4, at 49 [Plf.'s response papers, attaching contemporaneous letter from Plaintiff referencing date of decision].)

[16]     *See, e.g., Dawes v. Coughlin*, 612 N.Y.S.2d 337, 337-38 (N.Y. 1994) (describing procedural history of case in which Donald Selsky granted the plaintiff "supplementary appeal," which served as a motion for reconsideration, and explaining that "[n]o provision exists . . . concerning reconsideration of the Commissioner's decisions.  Notwithstanding the absence of explicit statutory or regulatory authority permitting respondent to reconsider an apparently final prior determination, we conclude that respondent acted properly in this case. . . .  In the absence of statutory or regulatory guidance, respondent is entitled to exercise some discretion in fashioning appropriate remedies . . . .") [citations omitted]; *cf. Miller v. Selsky*, 111 F.3d 7, 8 (2d Cir. 1997) (describing procedural history of case in which Donald Selsky *sua sponte* reversed his prior ruling, apparently based on argument raised by the plaintiff in an Article 78 proceeding challenging Selsky's decision).

claims that a supervisory official failed to train or supervise subordinates because of gross negligence, supervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates gross or deliberate indifference by failing to act.") (internal quotation marks and citations omitted).

Here, Plaintiff alleges in his verified Amended Complaint that "[i]n July 2005, Hamilton complained to J.T. Smith about the unconstitutional theft of mail being implemented at Shawangunk." (Dkt. No. 17, at ¶ 31.) "Smith refused to correct the policy being instituted by J. Maly and allowed the theft of mail to continue." (*Id.*) This sworn allegation (which, again, has the force and effect of a statement in an affidavit) creates a genuine issue of material fact as to whether Defendant had notice of Defendant Maly's alleged behavior. In addition, because Plaintiff swears that some of the mail tampering occurred after he made Defendant Smith aware of the problem (*see* Dkt. No. 17, at ¶ 31-35), there is genuine issue of material fact as to whether Defendant Smith was grossly negligent in his supervision of Defendant Maly.

For all of these reasons, Defendants' motion for summary judgment on this claim is denied.

### C.    Plaintiff's Fourteenth Amendment Claim of Violation of Due Process

In his Amended Complaint, Plaintiff alleges that Defendants Maly, Selsky and Davis violated his due process rights by precluding him from calling certain witnesses during Plaintiff's disciplinary rehearing, which resulted in Plaintiff being sentenced to twelve months in the Special Housing Unit ("SHU"). (Dkt. No. 17.) In his Report-Recommendation, Magistrate Judge Homer recommends that this claim proceed to trial because there is a genuine issue of material fact as to whether Defendant Maly violated Plaintiff's Fourteenth Amendment due process rights at his disciplinary hearing by refusing to call former inmate named Mathis (who

Plaintiff claims possessed exculpatory evidence) and a substance abuse program representative (who Plaintiff claims could have provided mitigating evidence).[17]  (Dkt. No. 60, at 9-11, 36-38.)

In their Objections to the Report-Recommendation, Defendants argue that Magistrate Judge Homer erred in his conclusion because (1) the record is clear that Defendant Maly attempted to contact Mathis, but was unsuccessful in locating him, and (2) Defendant Maly refused to allow other witnesses to testify at the second hearing only after interviewing these witnesses and determining that they lacked direct knowledge of the alleged incident.  (Dkt. No. 66.)

On January 12, 2005, Plaintiff was selected for a random drug test.  (Dkt. No. 58, Part 3, at 33.)  Two separate urinalysis tests were positive for cannabinoids.  (*Id*.)  As a result, Plaintiff was reported for a violation of Rule 113.24.  (*Id*.)  On January 31, 2005, Defendant Davis conducted a superintendent's hearing at Attica C.F. and found Plaintiff guilty.  (Dkt. No. 68, Part 7.)  Plaintiff appealed this determination, and a rehearing was scheduled for April 12, 2005, at Shawangunk C.F.  (Dkt. No. 58, Part 3, at 33.)

At his rehearing, Plaintiff requested that the hearing officer, Defendant Maly, allow him to call a former inmate (Mathis), who was recently released from prison, who could offer exculpatory evidence about Plaintiff's positive drug test.  (Dkt. No. 51, at 96-98, 121-23 [Hamilton Dep. Tr.].)  Defendant Maly interviewed some of the witnesses that Plaintiff requested, and found them to have no direct knowledge of the incident.  (Dkt. No. 58, Part 3, at 10.)  As a result, Defendant Maly determined that these witnesses were irrelevant, and

---

[17]    The Witness Interview Notice, filled out by Defendant Maly, indicates that Plaintiff sought to call Counselor Williams, Counselor Bosland, and/or "someone from OMH." (Dkt. No. 68, Part 2, at 9.)

accordingly denied Plaintiff's request to call them. (*Id.*) Defendant Maly also attempted to contact Mathis, but was unsuccessful in locating him. After interviewing the witnesses that he deemed irrelevant and attempting to contact Mathis to no avail, Defendant Maly proceeded with the hearing in Plaintiff's absence. (Dkt. No. 58, Part 3, at 34.)[18]

The Supreme Court has held that "an inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974). However, the Court also held that "the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." *Wolff*, 418 U.S. at 566. Furthermore, the Court in *Wolff* explained that "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators . . . [w]e must balance the inmates's interest [in avoiding the loss of a right or benefit] against the needs of the prison, and some amount of flexibility and accommodation is required." *Id.*; *see also Scott v. Kelly*, 962 F.2d 145, 147 (2d Cir. 1992) (request for witnesses "can be denied on the basis of irrelevance or lack of necessity").

"Emphasizing the caution courts should exercise before challenging disciplinary hearings, the Supreme Court instructs, '[p]rison officials must have the necessary discretion to keep a prison disciplinary hearing within reasonable limits and . . . to limit access to other inmates to collect statements or to compile other documentary evidence.'" *Dixon v. Goord*, 224 F. Supp.2d 739, 745-46 (S.D.N.Y. 2002) (citing *Wolff*, 418 U.S. at 566). "Deference to prison

---

[18]    Plaintiff refused to attend his hearing because he alleges that it was perfunctory. (Dkt. No. 58, Part 4, at 30-38.)

administrators may mean upholding a denial of a request even in situations where the 'denied witness might have provided testimony to exculpate [the inmate],' or where the reviewing court might have ruled differently had it been conducting the hearing." *Dixon*, 224 F. Supp.2d at 746 (citing *Afrika v. Selsky*, 750 F. Supp. 595, 601 [S.D.N.Y.1990]).

As an initial matter, the Court finds that Defendant Davis, who worked at Attica C.F. during the time in question, had no personal involvement in the disciplinary proceedings held in April 2005 at Shawangunk C.F., which give rise to Plaintiff's Fourteenth Amendment due process claims. As a result, Plaintiff's Fourteenth Amendment due process claim against Defendant Davis should be dismissed.

With regard to Defendant Maly, it is undisputed that he attempted to contact Mathis, using the telephone number provided to him by Plaintiff. (Dkt. No. 58, Part 3, at 13.) When Defendant Maly called that telephone number, "the local phone company responded that this number was disconnected." (*Id*.) In addition, Defendant Maly interviewed the witnesses that Plaintiff sought to call, and determined during these interviews that their testimony was irrelevant to the issue of whether Plaintiff tested positive for cannabinoids.

Even assuming that Mathis may have provided exculpatory testimony, it cannot be said that failure to call him (and the other requested witness) amounts to a violation of Plaintiff's due process rights given that Defendant Maly made efforts to contact Plaintiff's witnesses, and provided Plaintiff with an explanation (through the Witness Interview Notice Form) as to why they would not be testifying at his hearing.[19]    The Court notes that, as previously stated, courts

---

[19]    The Supreme Court has held that "prison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify but that they may do so either by making the explanation a part of the 'administrative record' in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a 'liberty' interest is

26

should exercise caution before challenging disciplinary hearings, and prison officials must have the necessary discretion to keep a prison disciplinary hearing within reasonable limits. *Dixon*, 224 F. Supp.2d at 746. Here, the Court finds that such discretion is properly exercised in giving some deference to the hearing officer's judgment as to (1) what constitutes relevant testimony, and (2) what constitutes a reasonable period of time in which to conduct a disciplinary hearing. *Id.*; *Wolff*, 418 U.S. at 566.

For these reasons, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's Fourteenth Amendment due process claims.

## IV.    ANALYSIS OF REMAINING CLAIMS

The only Objections offered by Plaintiff to Magistrate Judge Homer's Report-Recommendation regarding the claims not discussed above in Part III of this Decision and Order are simply reiterations of Plaintiff's previous arguments of his claims regarding a denial of mental health treatment by Defendant Skies, contaminated drinking water and poor ventilation in the prison facility, and wrongful placement in CSU. (*See* Dkt. No. 67.)

After carefully reviewing all of the papers in this action, including Magistrate Judge Homer's Report-Recommendation and Plaintiff's Objections thereto, the Court concludes that Magistrate Judge Homer's Report-Recommendation regarding the claims not discussed above in Part III of this Decision and Order is correct in all respects. Magistrate Judge Homer employed

---

challenged because of that claimed defect in the hearing. *Ponte v. Real*, 471 U.S. 491, 497 (1985). "In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it 'later.'" *Ponte v. Real*, 471 U.S. at 497. "Explaining the decision at the hearing will of course not immunize prison officials from a subsequent court challenge to their decision, but so long as the reasons are logically related to preventing undue hazards to 'institutional safety or correctional goals,' the explanation should meet the due process requirements as outlined in *Wolff*. *Id.*

27

the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the remainder of the Report-Recommendation for the reasons stated therein.

    **ACCORDINGLY**, it is

    **ORDERED** that United States Magistrate Judge David R. Homer's Report-Recommendation (Dkt. No. 60) is **<u>ACCEPTED</u>** and **<u>ADOPTED</u> as modified** by this Decision and Order; and it is further

    **ORDERED** that Defendant's motion for summary judgment (Dkt. No. 51) is **<u>DENIED</u>** with respect to Plaintiff's First Amendment claims against Smith and Maly regarding the tampering with his legal mail, specifically the Mathis affidavit; and it is further

    **ORDERED** that Defendant's motion for summary judgment (Dkt. No. 51) is **<u>GRANTED</u>** as to all other claims and Defendants; and it is further

    **ORDERED** that Plaintiff's claims against Defendants Gonzalez, Genovese, Parisi, Selsky, Davis, and Chiapperino are **<u>DISMISSED</u>** in their entirety.

Dated: September 30, 2009
         Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge